FILED

2019 Nov-20  AM 11:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DEMARCUS COLEMAN,** ) | |
| **AIS# 300844,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **CIVIL ACTION NO.:** |
| ) | **2:19-cv-00899-LSC-SGC** |
| ) | |
| **CORRECTIONAL OFFICER** ) | |
| **ZACHARY MCLEMORE, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## SPECIAL REPORT

COME NOW the Defendants, Zachary McLemore, Joe L. Binder, Keller Speaks and Roderick Gadson**,** by and through undersigned counsel, and file this Special Report in accordance with the Order of this Honorable Court.  (Doc. 4).

## PARTIES

1.     Plaintiff, DeMarcus Coleman ("Coleman"), is an inmate in the custody of the Alabama Department of Corrections ("ADOC"), who is incarcerated in the William E. Donaldson ("Donaldson") in Bessemer, Alabama.

2.     Defendant, Zackery McLemore ("Officer McLemore"), is employed with ADOC as a Correctional Officer at Donaldson.

3.     Defendant, Joe L. Binder ("Officer Binder"), is employed with ADOC as a Correctional Officer at Donaldson.

1

4.     Defendant, Keller Speaks ("Officer Speaks"), is employed with ADOC as a Correctional Officer at Donaldson.

5.     Defendant, Roderick Gadson ("Officer Gadson"), is employed with ADOC as a Correctional Officer at Donaldson.

## PLAINTIFF'S ALLEGATIONS

Around 10:45 a.m. on April 15, 2019, Defendants Binder, Speaks, Gadson, and McLemore sprayed the plaintiff with a chemical agent, and slapped, kicked, punched, stomped, dragged, and repeatedly struck the plaintiff with a baton, all without justification or excuse.  The Defendants would not allow the plaintiff to be seen or heard until he healed from his serious head injuries and bruises, which was about a month later.  The Defendants even hid the plaintiff from mental health officials.  The plaintiff alleges he still suffers from non-stop head and spine pain and now takes mental health medication because of the mental abuse he suffered. The plaintiff claims the Defendants subjected him to cruel and unusual punishment and excessive force and denied him medical and mental health care.  (Doc. 10).

## DEFENDANTS' EXHIBITS

1.     Exhibit A – Affidavit of Zackery McLemore;

2.     Exhibit B – Affidavit of Joe L. Binder;

3.     Exhibit C – Affidavit of Roderick Gadson;

4.     Exhibit D – Certified Medical Records;

5.     Exhibit E – Institutional Records; and

6.     Exhibit F – Affidavit of Keller Speaks.

## STATEMENT OF FACTS

On April 15, 2019 at around 11:00 a.m. Officers McLemore, Binder and Gadson were handing out food trays to inmates housed in the Y-Unit at Donaldson. (Exs. A, B and C).  Officer McLemore and Gadson approached cell Y-15 and Officer McLemore opened the cell door.  (Exs. A and  C).  When the cell door opened, Coleman exited the cell with his fist clinched and said he wanted to fight Officer McLemore.  Id.  Officers McLemore and Gadson attempted to get Coleman to calm down.  Id.  Coleman refused to follow orders and continued to act in an aggressive manner.  Id.  Officer McLemore then sprayed Coleman with Saber Red chemical spray.  Id.  After being sprayed, Coleman began to swing his arms and fists wildly at the officers.  Id.  Officer McLemore used palm heel strikes to Coleman's facial area in order to stop Coleman's aggression.  Id.  Officer Gadson and McLemore took Coleman to the floor and hand cuffed Coleman to the rear.  Id.

Coleman was taken to the infirmary where he was treated for contusions to his forehead, scratches and a contusion behind his left ear and a small contusion behind his right ear.  (Ex. D, p. 3).  Coleman was seen by medical staff a second time that day and told medical staff he was beat up by the police but did not identify who the "police" were.  (Ex. D, p. 4).  Captain Caldwell investigated the

3

use of force by Officers McLemore and Gadson and determined that the use of force was justified given Coleman's aggression.  (Ex. E, p. 1).

Officer Speaks was not mentioned in any of the incident reports.  (Exs. E and F).

## **ARGUMENT**

### I.   **Eleventh Amendment Immunity.**

The Eleventh Amendment bars claims against a state, its agencies, or its employees in their official capacity, unless the state consents.  Papasan v. Allain, 478 U.S. 265 (1986); Alabama v. Pugh, 438 U.S. 781, 782, 98 S.Ct. 3057 (1978) (citing Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347 (1974)); Ford Motor co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347 (1945); See also Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900 (1983); Quern v. Jordan, 440 U.S. 332, 99 S.Ct. 1139 (1979); Brown v. East Central Health District, 752 F.2d 615 (11th Cir. 1985).  As a department of the State of Alabama, and without the consent of the State, the ADOC and its employees in their official capacity are immune from suit under allegations of constitutional violations.  This immunity may not be circumvented by naming state officials as Defendants. Almond Hill School v. U.S., 768 F.2d 1039 (9th Cir. 1985).  "[T]he Supreme Court determined in Will v. Mich. Dept. of State Police, that state officials are not considered persons subject to suit for money damages under § 1983 when sued in

4

their official capacity.  491 U.S. 58, 109 S. Ct. 2304 (1989).  Thus, any claims against the Defendants in their official capacity are barred by Eleventh Amendment immunity and should also be dismissed.  See also Alden v. Maine, 527 U.S. 706, 119 S. Ct. 2240 (1999).

## II.  Qualified Immunity.

These Defendants are likewise entitled to immunity in their individual capacity.  Public officials in their individual capacities are afforded the defense of qualified immunity as a protection from money damages claims.  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In analyzing qualified immunity, the reviewing court must not only focus on the state of the law but what facts the Defendant knew at the time of his challenged conduct.  Anderson v. Creighton, 483 U.S. 635, 642 (1987) (tasking the reviewing court with determining whether "a reasonable officer could have believed [his conduct] to be lawful, in light of clearly established law *and the information the [Defendant] officers possessed*.") (emphasis added).  The shield of qualified immunity is indeed far-reaching:  "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v.

Briggs, 475 U.S. 335, 341 (1986).  In fact, the Eleventh Circuit has observed that "[q]ualified immunity thus represents the rule, rather than the exception."  Sanders v. Howze, 177 F.3d 1245, 1249 (11th Cir. 1999).

The principles described above remain viable even in light of the United States Supreme Court's holding in Hope v. Pelzer, 122 S. Ct. 2508 (2002).  The Eleventh Circuit explained that this Circuit had always allowed room for the denial of qualified immunity in cases where general principles applied with "obvious clarity."  Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).  Because that is rarely the case, however, the court will normally require case law arising out of a factually similar context before it concludes the public official had sufficient notice or fair warning.  In other words, "[t]he Supreme Court decision in Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), did not change the preexisting law of the Eleventh Circuit much."  Willingham, 321 F.3d at 1300.

While some Plaintiffs may feel that the qualified immunity doctrine gives public official defendants an unfair advantage, the United States Supreme Court has found sound policy reasons to endorse qualified immunity:  without it, public officials not only faced the prospect of financial loss through an adverse verdict, the litigation process itself distracted them from their governmental duties, inhibited their discretionary actions – forcing them to "err always on the side of

6

caution," and it deterred able people from public service.  Harlow, 457 U.S. at 816.

In order to establish that these Defendants were acting within their "discretionary capacity," a public official asserting qualified immunity need only show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988) (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir.1981)).  Courts should not be "overly narrow" in interpreting this requirement.  Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994).  The Defendants easily clear the "low hurdle" of demonstrating that any dealings they had with Coleman was within their discretionary authority.  Indeed, the only allegations made against the Defendants is that they were doing what correctional officials do, supervising and controlling inmates.  Of course, the Coleman may allege that these Defendants carried these duties out negligently, incompetently, or even unconstitutionally, but they are still duties normally associated with what correctional officials do—that is the standard for the finding of discretionary authority.

The burden then shifts *to the Plaintiff* to show that the Defendant official has violated a clearly established right, and that the law was clearly established. Travers v. Jones, 323 F.3d 1294, 1295 (11th Cir. 2003) ("Once the defendants established that they were acting within their discretionary authority, a point not in

dispute here, the burden shifted to the plaintiff to show that qualified immunity is inappropriate."). Once an official has asserted the defense of qualified immunity and shown that she was acting within his discretionary capacity, as the Defendants have here, the threshold inquiry a court must undertake is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). In other words, do the facts show that the Defendants' conduct violated the Plaintiff's constitutional rights? The first aspect of qualified immunity—determining whether the Plaintiff has stated a constitutional claim—while conceptually distinct from consideration of the Plaintiffs' claims on the "merits" is, for all practical purposes, not much different from determining whether the Plaintiff has created a genuine issue of material fact on the merits. In other words, if the Court determines that the Plaintiff has failed to create a genuine issue of fact as to whether the Defendants' actions constituted excessive force, then it necessarily also concludes that the Plaintiff has failed to state a constitutional claim, and this Defendants should be granted qualified immunity without further inquiry.

## III. Excessive Force.

Coleman cannot establish his burden to overcome qualified immunity because he cannot establish that alleged force used by the Defendants on April 15,

2019, was maliciously or sadistically applied for the purpose to cause harm, or for any other reason but to maintain and restore discipline.[1]   The standard used in analyzing excessive force claims arising out of a prison context is based on the Eighth Amendment.   The law is very clear on the point that prison officials are afforded wide latitude in dealing with inmate disciplinary problems.   In <u>Hudson v. McMillian</u>, the United States Supreme Court reasoned:

> [C]orrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmate. . . . Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

503 U.S. 1, 6 (1992) (citations omitted).

> The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.

> <u>Whitley</u>, 475 U.S. at 319 (1986).

> In evaluating the challenged conduct of jail officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment . . .. *Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security . . ..*   That deference extends to prison security measure taken in response to an actual confrontation with

---

[1] Officers Binder and Speaks deny using any force at all.

> riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.

Id. at 319 & 321-322.; Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991) ("[T]he courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline."); Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987).    "When the 'ever-present potential for violent confrontation and conflagration,' . . . ripens into actual unrest and conflict, the admonition that *'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,'* . . . carries special weight."    Whitley, 475 U.S. at 321 (emphasis in original).  In Whitley, the Court held that the "shooting [of an inmate in the leg] was part and parcel of a good-faith effort to restore prison security . . . [and] did not violate respondent's Eighth Amendment right to be free from cruel and unusual punishments."  475 U.S. at 319.

An excessive force claim carries with it a different (and higher) standard than deliberate indifference clams under the Eighth Amendment.  As explained in Flowers v. Bennett:

> Supreme Court precedent does, however, provide a different standard for Eighth Amendment/Fourteenth Amendment mistreatment claims depending upon the factual context of the claim.  For example, claims of prisoner/pretrial detainee mistreatment are analyzed under the deliberate indifference standard when they involve the alleged denial of medical care or the alleged failure to respond to a serious risk to

inmate health and safety. *A higher standard with a more culpable intent requirement is applied when the claim involves allegations of the use of excessive force*.

135 F. Supp. 2d 1150, 1155, n.6 (N.D. Ala. 2000) (emphasis added) (internal citations omitted). See Hudson, 503 U.S. at 8 ("What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause depends upon the claim at issue.").

In determining whether an excessive force violation has occurred, the proper inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21; Bozeman v. Orum, 422 F.3d 125 (11th Cir. 2005). "Thus, in order to prevail on an excessive-force claim, a plaintiff must demonstrate that those whole used force against him acted with malicious purpose. See Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002). In addition, a plaintiff must prove that a requisite amount of force was used against him. Hudson v. McMillian, 503 US 1, 9-10, 112 S.Ct. 995, 1000 (1992)." Connell v. Tate, 2012 WL 252817, 12 (M.D. Fla. 2012). "Under the [Whitley] standard, a prison security measure undertaken to resolve a disturbance gives rise to a §1983 claim *only if* the measure taken 'inflicted unnecessary and wanton pain and suffering' upon the prisoner . . .. Moreover, the analysis must be informed by the wide ranging deference which is to be accorded prison administrators acting to preserve

discipline and intuitional security. Thus, a prisoner may avoid . . . summary judgment, as in this case, *only if* the evidence viewed in the light most favorable to him *goes beyond a mere dispute over reasonableness of the force used and will support a <u>reliable inference of wantonness in infliction of pain.</u>*" <u>Brown v. Smith</u>, 813 F.2d 1187,1188 (11th Cir. 1987) (internal citations omitted)(emphasis added). "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support at reliable inference of wantonness in the infliction of pain … the case should not go to the jury." <u>Stanfil v. Talton</u>, 851 F.Supp.2d 1346, 1371 (M.D. Ga. 2012)(citing <u>Whitley</u>, 475 U.S. at 322).

The Court in <u>Whitley</u> established factors to consider in evaluating whether the use of force was wanton and unnecessary. These factors include: 1) the need for application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the prison official; 4) any efforts made to temper the severity of a forceful response; and 5) the extent of the injury suffered by the inmate. 475 U.S. at 1085.

In Coleman's case, the force applied during the incident was the use of a chemical agent, palm heel strikes to his facial area and a take down after he threatened to attack an officer, repeatedly failed to obey orders to calm down, and swung his fists and arms wildly at the officer Defendants. Coleman was given repeated opportunities to calm down and come into compliance. (Exs. A and C).

The use of force investigated and determined to be justified.  (Ex. E).  It should also be noted that Defendants Binder and Speaks deny *any* use of physical force. (Exs. B and F).  Further, the body chart taken immediately after the incident indicate injuries consistent with the record of the incident.  (Ex. D, p. 3).  See Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Roy v. Correctional Medical Services, Inc. 522 Fed.Appx. 597, 600 (11th Cir. 2013) (citing Scott and noting that, "Although Roy claims that he frequently complained to Holman medical staff regarding his deteriorating condition during this time, the record before us reflects that he only made his first complaint on December 8, thirty-four days after his visit to Dr. Newman" before affirming grant of summary judgment on the claim); Puckett v. Huizing, 2010 WL 1032697, 4 (W.D.Mich.,2010) (citing Scott and concluding that, "In this regard, plaintiff's story about his fingers is certainly contradicted by the medical record."); Skylstad v. Reynolds, 248 Fed.Appx. 808, 811 (9th Cir. 2007) (granting summary judgment after citing Scott and explaining that, "The medical evidence, however, directly contradicts Skylstad's version of events.  Although the dog bite was serious and required medical attention, there is no medical evidence of multiple dog bites, head

13

injury, or cuts on the arms.").

In applying the five <u>Whitley</u> factors to that incident as the records reflect, it is evident that no constitutional violation occurred.  (1) There was certainly a need for the application of force used and for discipline to be restored after Coleman threatened to fight an officer, refused to calm down, failed to obey direct orders, and swung his fists and arms wildly at the officers.  The Eleventh Circuit has held that that a correctional officer may use force to bring an inmate in compliance with a lawful order, and that failing to obey a direct order satisfies the first requirement that there is a need for an application of force.  <u>Brown v. Smith</u>, 813 F.2d 1187, 1189 (11th Cir. 1987).  The Seventh Circuit more fully explained the reasoning behind that need in <u>Soto v. Dickey</u>, 744 F.2d 1260 (7th Cir. 1984):

> When an order is given to an inmate there are only so many choices available to the correctional officer.  If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, *some means must be used to compel compliance, such as a chemical agent or physical force.*  While experts who testified on behalf of the plaintiffs, suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, *experience and common sense establish that a prison cannot be operated in such a way.*

> Discipline in a maximum security correctional institution no doubt is difficult, but it is essential if the prison is to function and provide for the care, safety and security of the staff and inmates.  Services to provide food, clothing, health, medical, cleaning, laundry and all other services would come to end without discipline.  Mob rule would take over.  There would not, and could not, be any protection for staff or inmates.  *Orders given must be obeyed.  Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.*

14

Someone must exercise authority and control.  One can quickly reason what would happen in a maximum security prison without proper discipline.

The evidence establishes that it is the policy and practice at WCI for officers to enter a cell to enforce compliance with orders.  *Inmates are and must be required to obey orders.  When an inmate refused to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials.  Such refusal and denial of authority places the staff and other inmates in danger.*  One of the plaintiffs' expert witnesses agreed that the institution cannot permit an inmate to violate a rule or disobey an order and that action must be taken to compel compliance with a lawful order.

Discipline needed to be restored, and because Coleman's continued defiance put the Defendants in a position of uncertainty as to their safety, Coleman needed to be restrained.  "The use of force was justified.  Officers McLemore and Gadson used a reasonable amount of force to control the situation and achieve a legitimate correctional objective."  (Ex. E, p. 1).

(2)  The amount of force was certainly comparable to the need.  *De minimis* uses of force cannot support a claim for a constitutional violation "provided that the use of force is not of a sort repugnant to the consciences of mankind."  Hudson, 503 U.S. at 9-10 (internal quotation marks omitted).  See Johnson, 206 Fed. Appx. at 885 (reasoning that even deliberate and unnecessary uses of force in "a relatively minor amount" are not repugnant to the "conscience of mankind" and therefore does not violate the Eighth Amendment).  In this instance, the Defendants used just enough force to restrain Coleman.  Once Coleman was secured, all force ceased.

(Exs. A, C and E).  Such a minor amount of force certainly is not repugnant to the conscience.  Coleman was evaluated by medical staff immediately following the incident and evaluated again.  (Ex. D, p. 3).

(3) The threat perceived by Defendants was reasonable, as was the minimal amount of force used to curb any such threat.  As was noted by the court in <u>Soto</u>, "[w]hen an inmate refused to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials.  Such refusal and denial of authority places the staff and other inmates in danger."  744 F.2d at 1267.

(4) Absent turning a blind eye to violations of institutional rules and the uncertainty of what Coleman would do next, there is nothing that Defendants could have done to temper the need to restrain Coleman.  In fact, he was given orders to calm down before any force was used but failed to do so.

(5) The body chart taken immediately after the incident noted no major injuries at all, much less than injury or distress reflective of Coleman's allegations that he was punched, kicked, stomped, dragged and repeatedly struck with a baton. Coleman was taken to the infirmary where he was treated for contusions to his forehead, scratches and a contusion behind his left ear, and a small contusion behind his right ear.  (Ex. D, p. 3).

In reviewing <u>Whitley</u>'s five factors as a whole as it relates to the April 15, 2019 incident, the evidence shows that Coleman presented the need to use the *di*

*minimus* force of restraining him so he could be brought into compliance. This Court should conclude that the Defendants' actions were not precipitated by the intent to cause pain to the Plaintiff, but rather to restore the discipline that was lost.

## IV.  Denial of Medical Care.

Coleman alleges in his complaint that he was denied proper medical treatment despite being escorted to the to the Health Care Unit where he was promptly decontaminated and treated. (Ex. D, p. 3). There are medical records that show he received medical treatment. (Ex. D). There is nothing in the record that would indicate any Defendant denied Coleman proper medical care, and hence, this claim is due to be dismissed. (Exs. A-F).

## <u>CONCLUSION</u>

Based upon the foregoing, the Defendants request this Honorable Court DISMISS this action, or treat this Special Report as a motion for summary judgment, and GRANT said motion in favor the Defendants.

Respectfully submitted,

STEVE MARSHALL
ATTORNEY GENERAL

 /s/ J. MATT BLEDSOE
J. MATT BLEDSOE (BLE006)
Assistant Attorney General
Counsel for Defendants McLemore, Binder, Speaks and Gadson

**OF COUNSEL:**

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130
334-242-7443
Matt.Bledsoe@AlabamaAG.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the November 20, 2019, filed the foregoing with the Clerk of the Court, using the ECF filing system, and that I have further served a copy of the foregoing upon the following parties, by placing same in the United States Mail, postage prepaid and properly addressed as follows:

Demarcus Coleman, AIS # 300844
W.E. Donaldson Correctional Facility
100 Warrior Lane
Bessemer, AL 35023

 /s/ J. MATT BLEDSOE
OF COUNSEL