FILED

2022 Mar-16  PM 05:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DEMARCUS COLEMAN,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:19-cv-00899-LSC-SGC** |
| | ) | |
| | ) | |
| **ZACHARY MCLEMORE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PRETRIAL NARRATIVE STATEMENT

Plaintiff Demarcus Vidal Coleman filed a pro se complaint pursuant to 42 U.S.C. § 1983 for violations of his civil rights. (Doc. 1). The complaint named as defendants the Alabama Department of Corrections and four correctional officers: Zackery McLemore, Joe Binder, Speaks, and Roderick Gadson. (Id. at 2-3).

## ***STATEMENT OF THE FACTS***

*Background*

1.       Demarcus Coleman was incarcerated in the Alabama Department of Corrections ("ADOC") from 2015 to 2019 and was protected by the Eighth Amendment to the Constitution.

2.       When Demarcus was first processed through Kilby in 2015, it was determined that he would be on the "mental health caseload" on account of a history of psychiatric disorders related to childhood trauma, including major depressive disorder.

3.      On February 20, 2019, Demarcus was transferred along with a number of other inmates from Fountain Correctional Facility to Donaldson Correctional Facility ("Donaldson").

4.      Demarcus was moved directly to Y-dorm (also known as the "behavioral modification unit," "restrictive housing," or "hot bay") upon being transferred to Donaldson, where they sent all new transfers until they could be reassigned to the general population housing area.

5.      Demarcus stayed in the behavioral modification unit for approximately two months leading up to the incident that gave rise to this lawsuit.

6.      Despite being identified by ADOC as in need of regular mental health care, at no time in his first few weeks at Donaldson was Demarcus seen by a mental health specialist. Demarcus reports that every other time he was transferred, because he was on the mental health caseload, he was seen by mental health professionals within 72 hours of arrival, per ADOC policy.

7.      During his first few weeks at Donaldson, Demarcus attempted to make multiple requests to be seen by a mental health professional. He wrote approximately 10 letters on the standard request form asking for a mental health evaluation. None of these requests were answered.

8.      Instead, Demarcus was kept confined in a restrictive housing unit that, per ADOC policy, is not supposed to be used for those on the mental health caseload.

*The Defendants and Witnesses*

9.      At the time of the incident, Roderick Gadson had been employed by ADOC for approximately 13 years. Since this use of force incident, Gadson has been promoted to lieutenant and works at St. Clair Correctional Facility. (Exhibit A p. 24).

10.     At the time of the incident, Zackery McLemore had been employed by ADOC for approximately 9 years. McLemore is no longer employed by ADOC, as he resigned in 2021. (Exhibit B p. 17, 41, 280).

11.     At the time of the incident, Joe Binder had been employed by ADOC for approximately 23 years. Binder was fired by ADOC following a use of force investigation that occurred after the incident with Demarcus. (Exhibit C p. 56).

12.     At the time of the incident, Captain Shannon Caldwell had been employed by ADOC since 2002. (Exhibit D p.10).

*The Day of the Incident*

10.     On Monday, April 15, 2019 at approximately 9 AM, Demarcus woke up to commotion outside of his cell.

11.     Officers Gadson, McLemore and Binder, who are known for using force by inmates and the Donaldson chaplains George Adams and David Bucher, had been involved in an altercation with an inmate known as "Ty." (Exhibit E p. 74-75; Exhibit F p. 35-36, 39). Demarcus awoke to the aftermath of this use of force incident.

12.     During the time that meals were supposed to be served, Demarcus saw Ty being escorted back from the infirmary with a patch over his eye, covered in blood, with a neck brace.

13.     After the officers returned Ty to his second floor cell, they resumed serving food trays.

14.     The officers served two trays and then got to the cell of an inmate named Robert Lamar Ashley, who was two cells down from Demarcus on the first floor corner. Outside people were walking by for church call, as the windows in Y-dorm overlook an outside corridor that people walk by to get to the chapel.

15.     Then the officers made Ashley get out of his cell. When Ashley was removed from his cell, he was not handcuffed initially, as he should have been according to ADOC policy. *See* Exhibit A at 75, 77-78. Ashley reports that he attempted to ask for help, anticipating that the officers would use violence against him like they did Ty.

16.     The officers over Y-dorm, including Gadson, McLemore and Binder, used force against Ashley and, as a result, had to take Ashley to the infirmary for a medical evaluation and body chart.

17.     Demarcus reports observing the officers using physical force against Ashley. While he was observing this use of force, Demarcus reports that Gadson pointed to him and said, "you're next."

18.     Inmates were running to the windows and calling out to the people going by and calling out to the Donaldson chaplain, George Adams, for help.

19.     Demarcus called out to Chaplain Adams, pleading with him to stop the violence by the officers against the inmates.  Demarcus reports that Chaplain Adams told Demarcus that he went to alert the Warden.

20.     Meanwhile, Ashley lost consciousness from the beating. The officers took him to the infirmary. Ashley could not walk, so they dragged him to the infirmary with his arms over the officers' shoulders.

21.     After this incident, Ashley could not walk properly for multiple weeks. His eyes were very swollen for over a week. When the officers brought him back to his cell, Ashley had a patch over his injured eye, a bandage around his finger and his head, and had to be transported using a wheelchair. Ashley later disclosed that he had severe injuries to his ribs.

22.     Once Ashley was back in his cell, the officers went back to their food tray cart to resume breakfast delivery. They gave an inmate named Vontae his food tray.

23.     Officer Binder had juice in his hand and approached Demarcus in his cell. McLemore was present, as was Gadson. (Exhibit C at 166).

24.     McLemore was wearing rubber gloves with padding.

25.     The door to Demarcus's cell opened, with Binder holding juice in one hand and the door handle in the other. Demarcus heard the click of the door opening.

26.     Demarcus notes that, when the door opened, he was far enough away from the officers so that they could not reach him. Demarcus reports that McLemore and Gadson approached his cell together (Exhibit G min. 52:30).

27.     McLemore sprayed Demarcus in the face with Sabre Red.

28.     Upon being sprayed, Demarcus fell and balled up on the ground to cover his face.

29.     Officers McLemore, Gadson and Binder began stomping on and kicking Demarcus.

30.     As evidenced by the photograph of Demarcus's injuries taken during the standard ADOC body chart conducted by medical staff after any use of force incidents, at least one of them struck Demarcus repeatedly with a baton.

31.     Gadson told Demarcus to get up and get out of his cell.

32.     Demarcus recalls that the yelling from the other inmates got quieter when the use of force by the officers began, so he believes that his cell door was partially closed by one of the officers. In the officers' version of events, they say that Demarcus came out of his cell demanding a fight with "the one with the white one." Demarcus maintains that he was retreating into the cell and was going to ask them not to give him food for that day to avoid a confrontation.

*After the Incident*

33.     Demarcus was led to the infirmary with Gadson and McLemore. Binder did not accompany them.

34.     According to the institutional medical records, at 11:28 a.m. on April 15, 2019, Nurse Pedrigo evaluated the plaintiff in the infirmary and documented his statement that he "opened the door to get [his] tray and got sprayed and beat with sticks." (Doc. 23-4 at 3). Nurse Pedrigo noted "multiple contusions" to the plaintiff's forehead, scratches and a contusion behind his left ear, and a small contusion behind his right ear. (Id.)

35.     Pedrigo put Demarcus in the shower with his clothes still on. After he got out of the shower, he was instructed to remove his T-shirt and jogging pants.

36.     Pedrigo took photos of his injuries and completed a body chart.

37.     Demarcus reports that Pedrigo inspected his injuries from a distance and only wrote down the injuries that the officers report, thus not recording all of his injuries.

38.     Demarcus was taken back to his cell and led inside by McLemore. Gadson remained outside of the cell.

39.     Officers McLemore and Speaks follow Demarcus into his cell. Demarcus was still wet and holding his wet clothes. The officers told him to put down his clothes and fight like a man.

40.     McLemore hit Demarcus on his side, still wearing his rubber knuckle gloves. When Demarcus leaned over in pain, Speaks hit Demarcus on the back. Gadson then told McLemore to back off before they killed him. Demarcus still had handcuffs on at this point.

41.     The officers exited the cell and locked the door. Nearly an hour later an officer returned to the cell to remove the handcuffs from Demarcus.

42.     Later in the evening on the day of the incident in question, Lieutenant Mohammad Jenkins was making the rounds serving food and saw Demarcus on the floor. Observing Demarcus in pain lying on the floor of his cell, Jenkins opened Demarcus's door and took him back to the infirmary. Jenkins said to Demarcus that these guys, referring to the officers, have been beating people up.

43.     Jenkins was arrested on March 9, 2022, for his role in the murder of another inmate in an unrelated incident. As a result of this murder investigation, the plaintiff has not yet been able to depose Jenkins but still considers him a critical witness in this incident.

44.     When Jenkins brought Demarcus to the infirmary for the second time that day, a second body chart was done, adding some injuries that were not recorded in the first one. Around 10:00 p.m. on April 15, when Demarcus was returned to the infirmary, he told "Nurse H" he did not know why he was beaten. (Doc. 23 at 4). Nurse H observed a bruise to the plaintiff's whole forehead and a bruise on his right shoulder and upper arm. (Id.). Nurse H also observed an abrasion to the plaintiff's forehead measuring approximately 9 centimeters, a bruise on the bridge of his nose, and a bruise on his head behind his right ear. (Id.). Pictures were not taken during this medical examination, despite it being ADOC protocol for injuries to be photographically documented when a body chart is completed.

*Medical Reports Following the Use of Force*

45.     On May 8, 2019, Dr. Roddam examined the plaintiff, who stated he felt "very discouraged" and was experiencing chest pain after officers hit his chest and face "about a week prior. (Doc. 23-4 at 5). Dr. Roddam noted the plaintiff had tenderness to his right posterior lateral chest, his "breath sound[ed] present," and he did not have wounds on his face. (Id.). Roddam

assessed the plaintiff with musculoskeletal pain, ordered a chest x-ray, and prescribed Ibuprofen and Tylenol. (Id.).

46.     On May 11, 2019, the plaintiff submitted a sick call request, reporting back pain and his suspicion that his ribs were broken. (Doc. 23-4 at 6). The plaintiff wrote that he had been submitting sick call requests but had not been seen; he complained of memory loss and "seeing bugs that aren't really there" since being struck in the head with a baton. (Id.).

47.     On May 14, 2019, the plaintiff was evaluated for back pain; he reported back and rib pain at 8 out of 10. (Id. at 7).

*Disciplinary Actions Following the Use of Force*

48.     Approximately 24 hours after the use of force incident, Gadson served a disciplinary to Demarcus.

49.     Demarcus reports that Gadson told him that the officers had to give him one to cover up what happened in case he started talking.

50.     According to ADOC policy, a disciplinary hearing is supposed to occur within 21 days of the disciplinary report being issued. On the last day in this 21-day window, the officers tried to proceed but could not because Demarcus had not yet met with a mental health counselor (a requirement for those inmates on the mental health caseload). That allowed the prison to have a 14 day extension. After those 14 days, prison staff again attempted to hold the hearing, but mental health was still not present. Despite being forbidden by ADOC policy, prison staff decided to proceed with the disciplinary hearing, and Demarcus was found guilty of the allegations in the disciplinary report.

*Internal Investigation Following the Use of Force*

51.     Approximately 30 days after the use of force against Demarcus, Captain Shannon Caldwell conducted a use of force investigation. (Exhibit D at 92-94).

52.     Caldwell collected statements from the involved officers.

53.     Caldwell did not collect witness statements from any inmates.

### *EXHIBITS LIST*

1.      DEMARCUS COLEMAN INMATE WRITTEN STATEMENT

2.      INCIDENT REPORT, CREATED 5/7/2019, LAST EDITED 5/17/2019

3.      EXHIBIT 8 - USE OF FORCE INVESTIGATIVE REPORT COMPLETED ON MAY 17, 209

4.      AFFIDAVIT OF ZACKERY MCLEMORE

5.      AFFIDAVIT OF JOE L. BINDER

6.      AFFIDAVIT OF RODERICK GADSON

7.      CERTIFIED MEDICAL RECORDS

8.      AFFIDAVIT OF KELLER SPEAKS

9.      DEMARCUS COLEMAN INSTITUTIONAL RECORDS

10.     TWO BODY CHARTS DONE ON DEMARCUS COLEMAN FROM APRIL 15, 2019: ONE AT 11:28 A.M. AND A SECOND AT 10:00 P.M.

11.     DEMARCUS COLEMAN CERTIFIED ALABAMA DEPARTMENT OF CORRECTIONS MEDICAL RECORDS

12.     DOJ INVESTIGATION OF ALABAMA'S STATE PRISONS FOR MEN, JULY 23, 2020

13.     DOJ INVESTIGATION OF ALABAMA STATE PRISON FOR MEN, APRIL 2019

14.     GADSON PERSONNEL RECORD

15.     MCLEMORE PERSONNEL RECORD (INCL. AMENDMENT WITH

RESIGNATION)

16.     KELLER SPEAKS PERSONNEL RECORD

17.     BINDER PERSONNEL RECORD

18.     JOE BINDER TERMINATION AND MANDATORY LEAVE DOCUMENTS,

FEBRUARY- MAY 2021

19.     AERIAL PHOTOGRAPH OF DONALDSON  CORRECTIONAL FACILITY

20.     FLOORPLAN OF DONALDSON Y-DORM

21.     REDACTED BED ROSTER FOR Y-DORM ON THE DATE OF THE

INCIDENT, APRIL 15, 2019

22.     REDACTED LIST OF THE NAMES OF THE CORRECTIONAL OFFICERS

ON DUTY AT DONALDSON CORRECTIONAL FACILITY ON APRIL 15, 2019

23.     DIVORCE PROCEEDINGS OF DEFENDANT GADSON, SHOWING

PATTERN OF SOME PHYSICAL AND EXTREME EMOTIONAL ABUSE

24.     TERMINATION DOCUMENTS OF JOE BINDER FROM THE DEPARTMENT

OF CORRECTIONS

25.     RECENT HOT BAY INCIDENTS AT DONALDSON, FROM §1983

LAWSUITS

26.     DEPOSITION OF ZACKERY MCLEMORE

27.     DEPOSITION OF JOE L. BINDER

28.     DEPOSITION OF RODERICK GADSON

29.     DEPOSITION OF DAVID BUCHER

30.    DEPOSITION OF GEORGE ADAMS

31.    DEPOSITION OF SHANNON CALDWELL

32.    DEMARCUS COLEMAN MEDICAL AND MENTAL HEALTH RECORDS

POST-INCARCERATION SHOWING ONGOING PHYSICAL AND MENTAL HARM

AFTER INCIDENT

### *NON-INMATE WITNESSES*

| Name | Contact Address | Place Of Employment |
|------|-----------------|---------------------|
| Shannon Caldwell | 28779 Nick Davis Rd, Harvest, AL 35749 | Limestone Correctional Facility |
| George Adams | 100 Warrior Ln, Bessemer, AL 35023 | Donaldson Correctional Facility |
| David Bucher | 100 Warrior Ln, Bessemer, AL 35023 | Donaldson Correctional Facility |
| Shanika Boyd | 928 Grant Town Rd., Munford, Al 36268 | Unknown |
| Mohammad Jenkins | Unknown | Unemployed (recently terminated from Donaldson Correctional Facility) |
| Nurse Hardie | Unknown | Unknown |

### *INMATE WITNESSES*

| Name | AIS Number | ADOC Correctional Facility |
|------|-----------|----------------------------|
| Robert Lamar Ashley | 00251501 | Staton Correctional Center |
| Savantae Terrelle Shoulders | 00286004 | Fountain Correctional Center |

| Jason Wayne Cole | 00223076 | Bibb County Correctional Facility |

### *SUMMARY OF THE ANTICIPATED TESTIMONY*

1.      Shannon Caldwell was the supervising officer who conducted the use of force investigative report after the incident in question. Caldwell determined that excessive force was not used. Caldwell is expected to testify about ADOC use of force determinations, as well as his personal involvement in the investigation of this matter.

2.      George Adams is the chaplain at Donaldson Correctional Facility. Demarcus contacted Adams through his window in his cell to ask for help in anticipation of being beaten by the Defendant officers. Adams is expected to testify about inmates asking for help from the chapel  through the windows in Y-dorm, as well as the reputation for use of force of the officers involved in this incident.

3.      David Bucher is the assistant chaplain at Donaldson Correctional Facility. Bucher is expected to testify about inmates asking for help from the chapel through the windows in Y-dorm, as well as the reputation for use of force of the officers involved in this incident and other incidents involving excessive force that occurred at Donaldson around the time of this incident.

4.      Shanika Boyd was one of the nurses who evaluated Demarcus's injuries after the use of force incident with the Defendant officers. Boyd is expected to testify about these injuries, as well as the culture of force and violence Donaldson Correctional Facility.

5.      Mohammad Jenkins was, at the time of the incident, a supervising Lieutenant at Donaldson Correctional Facility. Jenkins observed Demarcus in his cell after he was beaten by the Defendant officers, and he took Demarcus to have a second body chart done. Jenkins is

expected to testify about what he saw when he started his shift later in the afternoon on April 15, 2019, and what Demarcus told him happened with the Defendant officers.

6.      Nurse Hardie was one of the nurses who evaluated Demarcus's injuries after the use of force incident with the Defendant officers. Boyd is expected to testify about these injuries, as well as the culture of force and violence Donaldson Correctional Facility.

7.      Robert Lamar Ashley was beaten by the same officers as Demarcus on the morning of the incident in question. Ashley filed his own lawsuit against these officers, which was dismissed on procedural grounds. Ashley is expected to testify about his own encounter of excessive force with the officers and the excessive force by the officers that he observed on April 15, 2019.

8.      Savantae Shoulders was housed in the cell next to Demarcus in Y-dorm. Shoulders is expected to testify about the excessive force by the officers that he observed on April 15th, 2019.

9.       Jason Cole was housed in the cell next to Demarcus in Y-dorm. Cole is expected to testify about the excessive force by the officers that he observed on April 15th, 2019.

### ***SPECIAL AND COMPENSATORY DAMAGES***

Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant:

A.      All appropriate relief at law and equity;

B.      Declaratory relief and other appropriate equitable relief;

C.      Economic losses on all claims allowed by law;

D.      All available compensatory and consequential damages, including, but not limited to:

       a.      all available damages for pain and suffering,

       b.      physical, mental and emotional distress,

       c.      medical bills,

       d.      lost wages,

       e.      reduced earning capacity, and

       f.      all other noneconomic and economic damages available under the law;

E.      Punitive damages on all federal claims as allowed by law and in an amount to be determined at trial against all individual defendants and corporate defendants;

F.      Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

G.      Pre- and post-judgment interest at the highest lawful rate; and

H.      Any further relief at law or equity that this Court deems just and proper.


Respectfully submitted,

/s/ Richard A. Rice
Richard A. Rice
The Rice Firm, LLC
115 Richard Arrington Jr. Blvd. N.
Birmingham, AL 35203
Post Office Box 453
Birmingham, AL 35201
(205) 618-8733 ext 101

## CERTIFICATE OF SERVICE

I hereby certify that I have on this March 16, 2022, filed the foregoing with the Clerk of the Court, using the ECF filing system, and that I have further served a copy of the foregoing upon the following parties, by placing same in the United States Mail, postage prepaid and properly addressed as follows:

> J. Matt Bledsoe (BLE006)
> Office of the Attorney General
> Assistant Attorney General
> *Counsel for Defendants McLemore,*
> *Binder, Speaks and Gadson*
> 501 Washington Avenue
> Montgomery, Alabama 36130
> 334-242-7443

/s/ Richard A. Rice
Richard A. Rice
*Counsel for Plaintiff*

EXHIBIT A

# Deposition of Roderick Gadson

November 1, 2021

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://www.youtube.com/
watch?v=ztFjAQCnz9U

Roderick Gadson                                                    11/1/2021
                                                                  1 (1 - 4)



Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ALABAMA
3         SOUTHERN DIVISION
4
5    DEMARCUS COLEMAN,    )
6    PLAINTIFF,     )     )
7    Vs.         )CIVIL ACTION NO.
8    CORRECTIONAL OFFICER )2:19-cv-00899-LSC-SGC
9    ZACHARY MCLEMORE,    )
     Et al.,         )
10   DEFENDANTS.      )
11
12
13        * * * * * * * * * *
14
15        The deposition of RODERICK GADSON,
16   taken pursuant to stipulation and agreement
17   before Kaye Paulsen Ruiz, Certified Court
18   Reporter and Commissioner for the State of
19   Alabama at Large, at The Rice Firm, LLC, 115
20   Richard Arrington, Jr. Boulevard North,
21   Birmingham, Alabama 35203, on November 1,
22   2021, commencing at approximately 10:17 a.m.
23        * * * * * * * * * *

Page 2

1         APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF:
4    Richard A. Rice, Esq.
     THE RICE FIRM, LLC
5    115 Richard Arrington, Jr. Boulevard, N.
     Birmingham, AL 35203
6    (205)618-8733
     rrice@rice-lawfirm.com
7
8    ON BEHALF OF THE DEFENDANTS:
9    J. Matt Bledsoe, Esq.
     Assistant Attorney General
10   Office of the Attorney General
     501 Washington Avenue
11   Montgomery, AL 36130
     (334)242-7300
12   Matt.Bledsoe@AlabamaAG.gov
13   ALSO PRESENT:
14   Ms. Martrese Bell
15   Mr. Taylor Holland (Videographer)
16
17
18
19
20
21
22
23

Page 3

1         EXAMINATION INDEX
2    EXAMINATION BY:            PAGE
3     Mr. Rice         8
4
5         EXHIBIT INDEX
     PLAINTIFF'S
6    EXHIBIT NOS.  DESCRIPTION        PAGE
7    PX-1       Investigation report  289
     PX-2       Photograph
8    PX-3       Investigation report  301
     PX-5       Photograph       330
9    PX-6       Photograph       330
     PX-7       Incident report   356
10   PX-8       Investigative report  356
     PX-9       Affidavit       357
11   PX-10      Case list       400
     PX-11      Complaint       401
12   PX-12      Complaint       405
     PX-13      Complaint       421
13   PX-14      Photograph       435
14
15
16
17
18
19
20
21
22
23

Page 4

1         STIPULATIONS
2
3         IT IS STIPULATED AND AGREED that the
4    signature to and reading of the deposition
5    by the witness is waived, the deposition to
6    have the same force and effect as if full
7    compliance had been had with all laws and
8    rules of Court relating to the taking of
9    depositions.
10        IT IS FURTHER STIPULATED AND AGREED
11   that it shall not be necessary for any
12   objections to be made by counsel to any
13   questions, except as to form or leading
14   questions, and that counsel for the parties
15   may make objections and assign grounds at
16   the time of the trial, or at the time said
17   deposition is offered in evidence, or prior
18   thereto.
19        * * * * * * * * * *
20
21
22
23

Page 5

1              DEPOSITION

2

3         I, Kaye Paulsen Ruiz, a Court

4    Reporter of Birmingham, Alabama, and a

5    Notary Public for the State of

6    Alabama-at-Large, acting as Commissioner,

7    certify that on this date pursuant to

8    Alabama Rules of Civil Procedure and the

9    foregoing stipulations of counsel, there

10   came before me on the 1st day of November

11   2021, at The Rice Firm, LLC, 115 Richard

12   Arrington, Jr. Boulevard North, Birmingham,

13   Alabama 35203, commencing at approximately

14   10:17 a.m., RODERICK GADSON, witness in the

15   above cause, for oral examination, whereupon

16   the following proceedings were had:

17              THE VIDEOGRAPHER:  Good

18              morning.  Today is November

19              1st, 2021.  The time on the

20              monitor is 10:17 a.m.  My

21              name is Taylor Holland.

22              I'm here on behalf of Cite

23              Court Reporting in

Page 6

1              Montgomery, Alabama.  This

2              is the deposition of

3              Mr. Roderick Gadson which

4              was noticed by Richard Rice

5              for the case Coleman v.

6              McLemore, et al.  Counsel,

7              will you, please, identify

8              yourselves for the record

9              starting with the

10             Plaintiff.

11             MR. RICE:  Yeah.  Richard

12             Rice on behalf of Demarcus

13             Coleman.

14             MR. BLEDSOE:  Matt Bledsoe

15             on behalf of the

16             Defendants.

17             THE VIDEOGRAPHER:  Thank

18             you.  Will the court

19             reporter, please,

20             administer the oath to the

21             witness.

22        RODERICK GADSON, called as a witness,

23   after having first been duly sworn to speak

Page 7

1    the truth, the whole truth, and nothing but

2    the truth, was examined and testified as

3    follows:

4              THE REPORTER:  Usual

5              stipulations?

6              MR. RICE:  Yes.

7              EXAMINATION

8    BY MR. RICE:

9    Q.   All right.  Good morning, Mr. Gadson.

10        As previously stated, my name is

11        Richard Rice.  I'm the attorney for

12        Demarcus Coleman.  How are you doing

13        today?

14   A.   I'm all right.

15   Q.   Good, good.  And we just stated your

16        name for the record, so I can go ahead

17        and bypass that.  Is this your first

18        time being deposed?

19   A.   Huh-uh (indicating no).

20   Q.   Okay.  So one of the first things I

21        wanted to go over with you is that

22        obviously we are audio and video

23        recording, but we also have a court

Page 8

1    reporter here who will be transcribing

2    everything and so just to keep

3    everything clear and -- and clean, if

4    you will, it's better if you say yes or

5    no, as opposed to huh-uh or uh-huh or

6    head nods and things of that nature

7    just so we can have an exact record of

8    everything.  And, secondly, I would

9    just say if I ask you a question, if

10   you don't understand it, tell me and

11   I'll restate it, but if you do answer

12   the question, then I will assume that

13   you do understand the question.  Is

14   that fair?

15   A.   It is.

16   Q.   Okay.  And -- and some of these

17        questions is just background questions.

18        They're pretty standard.  So the first

19        thing I just want to ask you is are you

20        taking any type of medication today?

21   A.   Nope.

22   Q.   Okay.  So you haven't taken any

23        medication in the last 48 hours that

Roderick Gadson

Page 21

1  your job?  Is that something you try to
2  leave there --
3  **A.  My job --**
4  Q.    -- at the facility and not bring home
5  to your kids or --
6  **A.  My job is -- It ain't -- It's**
7  **stressful, but it ain't to the point**
8  **where you fixing to take it home and**
9  **take it out on your family.**
10  Q.   Uh-huh (indicating yes).  What are
11  some of the things you do with your
12  kids?  Do they play sports?  Do you
13  participate in those type of activities
14  or what are some of the things you do?
15  **A.  Be a father.**
16  Q.   Uh-huh (indicating yes).  Any specific
17  examples of anything that you -- you
18  could share with me to let us know what
19  type of activities you share with your
20  kids?
21  **A.  Just be a father.**
22  Q.   Are you active in your community?
23  **A.  What do you mean active?**

Page 22

1  Q.   Well, I mean, do you participate in
2  any type of community events or are
3  you -- do you volunteer, provide any
4  services for -- for your community
5  maybe through your church or through
6  another organization?
7  **A.  No.  I work a lot.**
8  Q.   Okay.  And what about your parents,
9  were they involved in law enforcement?
10  What type of work do they do?
11  **A.  My dad was.**
12  Q.   He was?  Was he a police officer, a
13  correctional officer?
14  **A.  Police.**
15  Q.   Where?
16  **A.  In Birmingham.**
17  Q.   Birmingham Police.  Is he retired now?
18  **A.  He is.**
19  Q.   Okay.  What about your mom?
20  **A.  She did a lot of stuff.  She had a real**
21  **estate company.  She sold insurance.**
22  **She did a lot.**
23  Q.   Do you think your dad is proud of you

Page 23

1  because you kind of followed in his
2  footsteps?
3  **A.  Corrections and policing is totally**
4  **different.**
5  Q.   Why do you say that?
6  **A.  Because it is.**
7  Q.   It's law enforcement, right?
8  **A.  I mean, it's still totally different.**
9  Q.   How would you say it's different?
10  **A.  Because they deal with them when**
11  **they -- They deal with them when they**
12  **try -- when they arrest them.  I deal**
13  **with them for long -- long periods of**
14  **time.  They may see them one or two**
15  **times -- when they arrest them and when**
16  **they go to court for a trial.  I have**
17  **to see this person every day, so it's**
18  **totally different.**
19  Q.   So you develop more of a relationship
20  with the inmates than --
21  **A.  I ain't going to say a relationship.**
22  **It's a professional relationship.**
23  Q.   Of course.  Do you feel like your

Page 24

1  position as a correctional officer that
2  you have certain knowledge about
3  inmates that the general public
4  wouldn't -- wouldn't have?  Would you
5  agree with that?
6              MR. BLEDSOE:  Object to the
7          form.
8              THE WITNESS:  What do you
9          mean general knowledge?
10  BY MR. RICE:
11  Q.   Would you have -- I should probably
12  say do you believe -- Would you agree
13  that you have specific knowledge about
14  inmates that members of the general
15  public wouldn't have?
16  **A.  Like what?**
17              MR. BLEDSOE:  Object to the
18          form.
19  BY MR. BISHOP:
20  Q.   Anything.  Just --
21  **A.  No.  I don't look at they -- I've**
22  **always been -- In my 15 years of**
23  **service, I don't -- I don't look at**

Page 73

1   something.

2   Q.   How often did you, you know, have a

3        riot in the dorm?

4   A.   I told you I never experienced that

5        when I was on the CERT team.

6   Q.   Okay.  For five years, you never saw

7        one riot?

8   A.   I ain't never seen a riot because, I

9        mean, a person that's seen a riot

10       probably wouldn't be here talking to

11       you.

12  Q.   And what type of disturbances were you

13       called for as a member of the CERT

14       team?

15  A.   When I was on the CERT team, the only

16       thing we was called for was searches.

17       I ain't never been in that type

18       situation where I've been in a big

19       disturbance or something like that or a

20       riot.

21  Q.   Can you describe to me the process of

22       how you conduct a search as a member of

23       the CERT team?

Page 74

1            MR. BLEDSOE:  Object to the

2        form.

3            THE WITNESS:  I mean, you

4        search a bed.  You search

5        the inmate.  You pat them

6        down and you search his

7        property.

8   BY MR. RICE:

9   Q.   Do you secure the inmate before you

10       start searching the room or his cell?

11  A.   It's different --

12           MR. BLEDSOE:  Object to the

13       form.

14           THE WITNESS:  It just

15       depends.  It's different

16       situations.

17  BY MR. RICE:

18  Q.   So what is a situation in which you

19       would begin to search an inmate's cell

20       in which you first didn't secure the

21       inmate?

22  A.   You said if the inmate is in -- If the

23       inmate is in general population, why

Page 75

1        would I secure him?  I would make him

2        stand outside or -- I -- What I do is,

3        if I'm searching an inmate's cell, I,

4        like, have another -- If we have enough

5        officers, I have one -- one officer

6        stand out there with him or I stand out

7        there with him when the officer is

8        searching his cell so they can look and

9        see, so if you do find some contraband

10       or something, the inmate can't say,

11       "Well, okay, you put it on me."  That's

12       how I conduct it.

13  Q.   So you would first remove the inmate

14       from the cell?

15  A.   Yeah, but he can stand outside the cell

16       and watch what the officers -- provide

17       security outside the cell.

18  Q.   Would you put him in handcuffs first?

19  A.   Why would I put him in handcuffs if

20       he's in general population?  Now, if

21       he's in restricted housing, he -- he

22       would be placed in handcuffs before he

23       comes out of the cell.

Page 76

1   Q.   But if he's not in restricted housing,

2        he wouldn't be placed in handcuffs

3        first?

4   A.   If he becomes -- if he becomes

5        disruptive or combative, he'll be --

6        he'll be -- I'll attempt to put him in

7        handcuffs.

8   Q.   And what if he refuses to allow you to

9        handcuff him?

10  A.   I mean, you probably will get a

11       disciplinary.  There ain't no way.

12  Q.   If you had an inmate that was in

13       restrictive housing and you received a

14       call to search his cell and you went to

15       his cell and you attempted to place

16       handcuffs on him and he chose not to

17       allow you to handcuff him, what would

18       you do in that situation?

19  A.   If he chose not to let me put handcuffs

20       on him?

21  Q.   Or any of the other CERT members that

22       are with you.

23  A.   I'm not on the CERT team.

Page 77

1  Q.   I know, but when you were.

2  A.   When I was on the CERT team?

3  Q.   Yes.

4  A.   I was -- I was an officer when I was on

5       the CERT team, so what I would do is I

6       would report it to a supervisor and

7       then I'd let the supervisor make the

8       decision on what he wanted -- he or she

9       wanted to do.

10 Q.   And, typically, when you went to the

11      cell to conduct these searches, would

12      you not have a supervisor with you?

13 A.   It just depends on who -- It just

14      depends. You don't have to have a

15      supervisor conduct the search. You

16      don't.

17 Q.   So you would just stop the search and

18      ask the supervisor what you could do in

19      that situation?

20 A.   It ain't stopping the search because

21      being in restricted house, the searches

22      never start because I just can't open

23      his door. I just can't open his door

Page 78

1       and go in there. He has to be placed

2       in handcuffs first.

3  Q.   Okay. I'll come back to that.

4       What -- what would you say is the most

5       challenging thing about your job today

6       as a lieutenant?

7  A.   Shortage -- staff shortage.

8  Q.   Staff shortages? Why is that

9       stressful?

10      MR. BLEDSOE: Object to the

11      form.

12 BY MR. RICE:

13 Q.   Or why is that challenging?

14 A.   What you mean why is it challenging?

15 Q.   Why is it challenging when you have a

16      staff shortage?

17 A.   Because you still have to get stuff

18      done and you're short of staff. That's

19      why -- That's how it's challenging.

20 Q.   So you have more responsibilities than

21      you, otherwise, would?

22 A.   As a supervisor?

23 Q.   As a supervisor, yes.

Page 79

1  A.   Of course you're going to have more

2       responsibility.

3  Q.   Okay. And if I ask you questions that

4       just seem silly or obvious, I'm not the

5       witness. I'm only the attorney, so I

6       can't -- I can't give testimony.

7  A.   I understand. I don't take it

8       personal.

9  Q.   Okay.

10 A.   I don't take nothing personal.

11 Q.   Okay. What do you think that the

12      prison system can do to reduce some of

13      that -- those challenges that you just

14      mentioned?

15      MR. BLEDSOE: Object to the

16      form.

17      THE WITNESS: Hire more

18      people.

19 BY MR. RICE:

20 Q.   And what about incarcerate fewer

21      people?

22      MR. BLEDSOE: Object to the

23      form.

Page 80

1       THE WITNESS: I ain't -- I

2       can't --

3  BY MR. RICE:

4  Q.   I mean --

5  A.   I'm not at judge. I'm not a DA. I

6       can't -- I can't go and tell nobody not

7       to incarcerate somebody. I mean, I

8       don't -- I don't -- I don't get into

9       all that.

10 Q.   Yeah.

11 A.   I just have a job -- I've got a job to

12      do. When they come to us, I've got a

13      job to do. I can't --

14 Q.   But you can't hire anybody either, can

15      you?

16 A.   I don't do the hiring. We've got a

17      personnel department in Montgomery.

18 Q.   I know, but I asked you one of the

19      things that could be done and you said

20      hire more officers, so -- that's just

21      your opinion. I'm not saying you can

22      do it, but that's just your opinion,

23      right?

EXHIBIT B

# Deposition of Zachary McLemore

November 2, 2021

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://vimeo.com/
688393617/
fbf8a4975a

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF ALABAMA
3       SOUTHERN DIVISION
4       CASE NUMBER
5       2:19-CV-00899-LSC-SGC
6
7   DEMARCUS COLEMAN,
8       Plaintiff,
9   V.
10  CORRECTIONAL OFFICER ZACHARY MCLEMORE, et al.,
11      Defendants.
12
13
14
15  DEPOSITION TRANSCRIPT OF
16      ZACKERY MCLEMORE
17
18
19
20      NOVEMBER 2, 2021
21      8:43 A.M.
22
23

Page 2

1       The deposition of ZACKERY MCLEMORE
2   was taken before Tanya D. Cornelius, CCR, on
3   November 2, 2021 by Richard Rice, commencing at
4   approximately 8:43 a.m., at The Rice Law Firm,
5   LLC, 115 Richard Arrington Jr. Boulevard, North,
6   Birmingham, Alabama pursuant to the stipulations
7   set forth herein.
8
9       S T I P U L A T I O N
10      IT IS STIPULATED AND AGREED by and
11  between the parties through their respective
12  counsel that the deposition of ZACKERY MCLEMORE
13  may be taken before Tanya D. Cornelius, CCR and
14  Notary Public, State of Alabama at Large, at the
15  law offices of The Rice Law Firm, LLC, 115
16  Richard Arrington Jr. Boulevard, North,
17  Birmingham, Alabama, on November 2, 2021,
18  commencing at approximately 8:43 a.m.
19      IT IS FURTHER STIPULATED AND AGREED
20  that the signature to and the reading of the
21  by the witness is waived, the deposition to have
22  the same force and effect as if full compliance
23  had been had with all laws and rules of Court

Page 3

1   relating to the taking of depositions.
2       IT IS FURTHER STIPULATED AND AGREED
3   that it shall not be necessary for any
4   objections to be made by counsel to any
5   questions, except as to form or leading
6   questions and that counsel for the parties may
7   make objections and assign grounds at the time
8   of trial or at the time said deposition is
9   offered in evidence, or prior thereto.
10      IT IS FURTHER STIPULATED AND AGREED
11  that notice of filing of the deposition by the
12  Commissioner is waived.
13
14
15
16
17
18
19
20
21
22
23

Page 4

1       A P P E A R A N C E S
2
3
4   APPEARING ON BEHALF OF THE PLAINTIFF:
5       THE RICE LAW FIRM, LLC
6       BY:  Richard Rice, Esq.
7       115 Richard Arrington Jr. Blvd. North
8       Birmingham, Alabama  35203
9
10
11  APPEARING ON BEHALF OF THE DEFENDANTS:
12      OFFICE OF THE ATTORNEY GENERAL
13      BY:  Tara Hetzel, Esq.
14      501 Washington Avenue
15      Montgomery, Alabama  36130
16      (Via Zoom)
17
18  ALSO PRESENT:  Taylor Holland, Videographer
19
20
21
22
23

Page 5

1          I N D E X

2

3          EXAMINATION INDEX

4  ZACKERY MCLEMORE

5     BY MR. RICE              9

6

7

8       * * * * * * * * * * * * * *

9

10         EXHIBIT INDEX

11  Plaintiff's Exhibit

12  1   Report                 154

13  2   Aerial view            162

14  3   Report                 173

15  4   Personnel file         279

16  5   Photo                  193

17  6   Photo                  194

18  7   Incident report        197

19  8   Investigation          197

20  9   Affidavit              197

21  10  Case list              256

22  11  Lawsuit                259

23  12  Lawsuit                261

Page 6

1          EXHIBITS (Continuing)

2

3  13  Lawsuit                 263

4  14  Lawsuit                 265

5  15  Lawsuit                 270

6  16  Lawsuit                 274

7  17  Lawsuit                 276

Page 7

1          I, Tanya D. Cornelius, a Certified

2  Court Reporter, and a Notary Public for the

3  State of Alabama at Large, acting as

4  Commissioner, certify that on this date,

5  pursuant to the Alabama Rules of Civil

6  Procedure, and the foregoing stipulation of

7  counsel, there came before me at the law offices

8  of The Rice Law Firm, LLC, 115 Richard Arrington

9  Jr. Boulevard, North, Birmingham, Alabama,

10  commencing at approximately 8:43 a.m. on

11  November 2, 2021, ZACKERY MCLEMORE, witness in

12  the above cause, for oral examination, whereupon

13  the following proceedings were had:

14

15

16

17

18          VIDEOGRAPHER:  Good morning.  We're

19  going to go on the record.  Today is November

20  2nd, 2021.  The time on the monitor is 8:43 a.m.

21  My name is Taylor Holland.  I'm here on behalf of

22  Cite Court Reporting of 1521 Mulberry Street,

23  Montgomery, Alabama.

Page 8

1          This is the deposition of Mr. Zackery

2  McLemore, which was noticed by Attorney Richard

3  Rice for the case of Coleman V. McLemore, et al.

4          Counsel, please identify yourselves

5  for the record, starting with the plaintiff.

6          MR. RICE:  Richard Rice on behalf of

7  Mr. Demarcus Coleman.

8          MS. HETZEL:  Tara Hetzel on behalf of

9  the DOC, defendant.

10          VIDEOGRAPHER:  Thank you.

11          Will the court reporter please

12  administer the oath to the witness.

13

14

15          ZACKERY MCLEMORE,

16      being first duly sworn, was examined

17          and testified as follows:

18

19

20          THE REPORTER:  Will this be usual

21  stipulations?

22          MR. RICE:  Yes.

23          MS. HETZEL:  Yes, ma'am.

Page 9

1       EXAMINATION
2   BY MR. RICE:
3       Q.   Okay.  Mr. McLemore, my name is
4   Richard Rice, as I just stated.  I'm an attorney
5   representing Mr. Demarcus Coleman.  Have you ever
6   participated in a deposition before?
7       A.   No, sir.
8       Q.   Okay.  So this is your first
9   deposition?
10      A.   Yes, sir.
11      Q.   So today I'll be asking you a series
12  of questions, and it's important for only one of
13  us to speak at a time, because we have a court
14  reporter here who is going to be transcribing the
15  entire conversation.  And so it's difficult for
16  her to be able to hear both of us at the same
17  time if we're both speaking.
18          And I would ask that you answer any
19  question verbally, audibly with a yes or no if
20  that's appropriate.  Try to refrain from using
21  huh-uh (negative response) or uh-huh (positive
22  response), which is common.  We all do it, but
23  it's just not very conducive to us being able to

Page 10

1   keep a clean record for the deposition.
2           And if you don't understand one of my
3   questions, if it's mumbled or I'm talking too
4   fast or it's just not worded correctly, just tell
5   me that you don't understand, and, of course,
6   I'll try to restate the question in a way that's
7   more comprehensible.  And if you do answer the
8   question, though, I will assume that you
9   understand the question.
10          And your attorney is obviously
11  participating via Zoom.  And so, typically, if
12  she has an objection, you can still proceed to
13  answer the question after she finishes with her
14  objection, and she probably would instruct you
15  not to answer any questions that she doesn't want
16  you to answer.  But, otherwise, it should be fine
17  if she objects for you to proceed to answer the
18  question.  Is that acceptable to you?
19      A.   Yes.
20      Q.   Okay.  Would you state your name
21  again for the record, your full name?
22      A.   Zackery Scott McLemore.
23      Q.   Okay.  And I understand that you were

Page 11

1   working last night; is that right?
2       A.   Yes, sir.
3       Q.   Where do you work?
4       A.   Warrior Met, coal mines.
5       Q.   All right.  And what type of shift
6   did you work last night, how many hours?
7       A.   Twelve-hour shift, 7 P to 7 A.
8       Q.   How long have you been working in
9   that capacity?
10      A.   About a month.
11      Q.   Now, are you taking any type of
12  medication or anything today or in the last, say,
13  forty-eight hours that would impact your ability
14  to understand or respond to my questions
15  truthfully?
16      A.   No.
17      Q.   How old are you?
18      A.   Twenty-nine.
19      Q.   What year were you born?
20      A.   1992.
21      Q.   All right.  And where were you born?
22      A.   Winfield, Alabama.
23      Q.   Is that where you spent most of your

Page 12

1   childhood?
2       A.   Yes, sir.
3       Q.   And were you raised by both parents?
4       A.   Yes, both parents.
5       Q.   Any siblings?
6       A.   Yes.  I have three brothers and one
7   sister.
8       Q.   And did you attend any churches as a
9   child?
10      A.   Yes, I did.
11      Q.   What church is that?
12      A.   Rock City Church of God.
13      Q.   And is that the church you attend
14  now?
15      A.   No.
16      Q.   Would you consider yourself to be a
17  religious person?
18      A.   I do.
19      Q.   Okay.  Are you a member of a church?
20      A.   I am.
21      Q.   What church is that?
22      A.   Gum Springs.
23      Q.   Say that again for me.

Page 13

1    A.   Gum Springs, G-u-m, Springs.
2    Q.   Where is that located?
3    A.   Rock City, Alabama.  They're a
4 Freewill Baptist.
5    Q.   Freewill Baptist.  Okay.  Where is
6 Rock City, Alabama?
7    A.   It would be east of Winfield, west of
8 Jasper.
9    Q.   Okay.  And so did you as a child have
10 any aspirations, career aspirations?  What did
11 you want to do when you grew up?
12   A.   Law enforcement and coal miner.
13   Q.   Where did you attend high school?
14   A.   Brilliant.
15   Q.   What was the name of it?
16   A.   Brilliant High School.
17   Q.   That's an interesting name for a high
18 school.  What year -- did you graduate?
19   A.   Yes, I did.
20   Q.   Okay.  What year?
21   A.   2010.
22   Q.   And did you have any education beyond
23 high school?

Page 14

1    A.   No, sir.
2    Q.   Okay.  Did you play any sports in
3 high school?
4    A.   Yes, sir.
5    Q.   What sports did you play?
6    A.   Football, baseball, and track.
7    Q.   Okay.  Did you have any family
8 members when you were a kid that happened to be
9 incarcerated or ever put in jail?
10   A.   Yes, I did.
11   Q.   You did?  Who?
12   A.   My father and my brother.
13   Q.   What was your father incarcerated
14 for?
15   A.   I'm really not sure.  It was before I
16 was born.
17   Q.   Do you know how much time he served?
18   A.   A little over three years, I believe,
19 but he come back and was found not guilty.
20   Q.   What about your brother?
21   A.   He served eighteen months for
22 manufacturing controlled substance.
23   Q.   Do you know what your dad was charged

Page 15

1 for?  I know you said he was exonerated.
2    A.   I'm not sure.
3    Q.   So tell me about the process that you
4 follow to become a correctional officer.
5    A.   My uncle was a -- well, still is a
6 lieutenant with the Department of Corrections.  I
7 have several cousins that are with the Department
8 of Corrections.
9    Q.   What's your uncle's name?
10   A.   Archie Giddy.
11   Q.   Spell his last name for me.
12   A.   G-i-d-d-y.
13   Q.   What about your cousins, what are
14 their names?
15   A.   Kelsey Millwood.
16   Q.   Man or woman?
17   A.   Man.
18   Q.   And do you have another cousin that
19 works with the DOC?
20   A.   Not that's still working there.
21   Q.   Okay.  What was your cousin's name
22 that previously worked for the Alabama Department
23 of Corrections?

Page 16

1    A.   Chris Hallmark.
2    Q.   And your cousin, Mr. Giddy, where is
3 he?  Which facility is he working with?
4    A.   He is at Hamilton A & I now.
5    Q.   What about Mr. Millwood?
6    A.   Hamilton A & I.
7    Q.   And so your uncle maybe referred you
8 to the job; is that right?
9    A.   Yes.
10   Q.   And then you filled out an
11 application?
12   A.   Yes, sir.
13   Q.   Okay.  Did you have to take any
14 tests?
15   A.   Yes, sir, I took a on-site physical
16 agility test and a written test.
17   Q.   And how did you score on those tests?
18   A.   I passed.  I'm not sure what the
19 score was or anything.
20   Q.   Right.  And what motivated you to
21 want to become a correctional officer?
22   A.   It was a stepping stone in law
23 enforcement.

Page 17

1  Q.  Did you have aspirations to become a
2  police officer?
3  **A.  No, not anymore.**
4  Q.  What changed your mind?
5  **A.  Corrections.**
6  Q.  What about it?
7  **A.  Everything about it.  It's not what I**
8  **thought it would be.**
9  Q.  What did you initially think it would
10 be?
11 **A.  To help people.**
12 Q.  When you say help people, what kind
13 of people?  Who would you be helping?
14 **A.  Everyone, community, the people**
15 **incarcerated.**
16 Q.  When were you first hired by the
17 Alabama Department of Corrections?
18 **A.  July 2nd of 2012.**
19 Q.  And how long after the hire date did
20 you find out that it wasn't what you thought it
21 would be?
22 **A.  About nine years later.**
23 Q.  Was there one particular incident or

Page 18

1  something that stands out to you that was a
2  pivotal moment to help you realize it wasn't what
3  you thought it would be?
4  **A.  No.  It's like any other job.  It's**
5  **got its good days and it's got its bad days.**
6  Q.  Yeah, but ultimately -- you said this
7  was something you kind of aspired to do as a kid,
8  and then after nine years, you just gave up on
9  your career dream, right?
10 **A.  Right.**
11 Q.  So the bad days outnumbered the good
12 days?
13 **A.  They did.  And then with everything**
14 **that's going on in the world with law**
15 **enforcement, it's too much of a jeopardy to put**
16 **myself in.**
17 Q.  What do you think -- what is going on
18 in the world with law enforcement?  What do you
19 mean by that?
20 **A.  That, I mean, they're getting shot.**
21 Q.  You knew that was one of the risks
22 when you signed up, right?
23 **A.  Yes, but not the way that it is now.**

Page 19

1  Q.  Do you think more police officers are
2  being shot now than when you were a kid?
3  **A.  I believe so.**
4  Q.  Do you think the statistics would
5  support that or do you think it's just media
6  attention or what?
7  **A.  I'm not sure.**
8     MS. HETZEL:  Object to the form.
9  Q.  Do you think there's actually more
10 police officers being shot today based on the
11 statistics?
12 **A.  I'm not sure.**
13 Q.  Do you think that there's more media
14 coverage now about everything than there was when
15 you were a child?
16 **A.  I agree the media is covering**
17 **everything.**
18 Q.  And we'll probably come back to that,
19 because I do want to understand more about what
20 changed your mind about being a correctional
21 officer, but I want to ask you some more
22 background questions first.  Are you married?
23 **A.  I am.**

Page 20

1  Q.  How long have you been married?
2  **A.  Ten years, I believe.**
3  Q.  Do you have any kids?
4  **A.  Yes, I have a five-year-old son.**
5  Q.  How would you describe yourself as a
6  father?
7  **A.  I think I'm your typical father.  I**
8  **spend every moment I can with my child, trying to**
9  **have fun doing what he needs to do, but raise him**
10 **to be a responsible adult.**
11 Q.  Has he started school already?
12 **A.  He has.**
13 Q.  What type of things do y'all do
14 together?
15 **A.  Play sports, play video games, watch**
16 **cartoons.**
17 Q.  Are you a fisherman?
18 **A.  I am.**
19 Q.  Okay.  Do you take your son fishing
20 with you?
21 **A.  I do.**
22 Q.  Do you feel like the dangerous
23 aspects of your job, did that sometimes create

Page 41

1 Corrections let you down as an employee?
2       MS. HETZEL: Object to the form.
3   Q. You can still answer the question.
4   A. No.
5   Q. Why not?
6   A. They had a job to do just like I did.
7   Q. Yeah, but as a kid, you wanted to be
8 a correctional officer. That was your dream job.
9 And within nine years, your dream was taken away
10 from you.
11   A. We all have dreams.
12   Q. But if you would have been
13 transferred to Hamilton, do you think you still
14 would have left the Department of Corrections?
15   A. Possibly.
16   Q. It's possible. Do you think it would
17 have been likely?
18   A. It would have been very likely. If I
19 would have had the job opportunity that I have
20 now, yes.
21   Q. Have you ever looked at statistics to
22 compare, you know, what professions and which
23 jobs are the most dangerous?

Page 42

1   A. No.
2       MS. HETZEL: Object to the form.
3   Q. Do you know whether or not working in
4 the coal mine is more dangerous than being a
5 police officer or a correctional officer?
6       MS. HETZEL: Object to the form.
7   A. I have no idea.
8   Q. Have you ever looked at the
9 statistics to see per capita the number of coal
10 miners that encounter dangerous or
11 life-threatening injury as opposed to a police
12 officer?
13       MS. HETZEL: Object to the form.
14   A. No, I haven't.
15   Q. What is it about your current job
16 that you like better than being a correctional
17 officer?
18   A. The hands-on work and physical labor.
19   Q. Do you feel like you're contributing
20 to public safety as a coal miner in the same way
21 that you were as a correctional officer?
22       MS. HETZEL: Object to the form.
23   A. Not personal safety, but I'm a

Page 43

1 resource that's a must have.
2   Q. What level of security is Donaldson?
3   A. I'm not sure.
4   Q. Do you know the different levels of
5 security for the prisons?
6   A. No.
7   Q. Do you know what your final salary
8 was as a correctional officer, as a senior
9 correctional officer for the Department of
10 Corrections?
11   A. No.
12   Q. You don't know the general range?
13   A. I cannot recall.
14   Q. Earlier you said the thing that you
15 were most proud of about being a correctional
16 officer was that you provided for your family; is
17 that not right?
18   A. Yes.
19   Q. But you don't know how much you
20 provided for them? You don't know the amount?
21   A. I can't give you an exact figure. A
22 roundabout number, I don't know.
23   Q. When you were a correctional officer,

Page 44

1 did you regularly work overtime?
2   A. Yes.
3   Q. Do you know on average how many
4 overtime hours you worked per week?
5   A. I have no idea.
6   Q. Do you think you worked at least
7 fifty hours per week?
8   A. Fifty hours of overtime per week?
9   No. Total.
10   A. Total? I'm sure I did.
11   Q. Do you think you worked at least
12 sixty hours total per week?
13   A. Depending on the week.
14   Q. Sometimes you did, though?
15   A. Possibly.
16   Q. Do you think you ever worked seventy
17 hours a week?
18   A. I have no idea.
19   Q. Is it possible that you would have?
20   A. There's a very slight chance.
21   Q. And how would you describe the
22 benefits package that you received as a
23 correctional officer?

Page 277

1 told me to step in first, and then Speak, O'Neal,
2 McLemore.  When I go in, Zackery Speak told me to
3 face the wall while they shut my cell down.
4 After that, then he told me to stay facing
5 straight.  That when he hit me in the side of my
6 face, that when McLemore hit me in my back.  That
7 cast a burst to come out.  They started jumping
8 on me real bad.  That cost blood to go
9 everywhere.
10     Q.   Okay.  That's good.  Do you recall
11 this incident?
12     A.   No.
13     Q.   Do you dispute what happened even
14 though you don't remember it?
15     A.   Yeah, I mean, I dispute his
16 allegations.  I do remember the inmate.  He was
17 working for me in the kitchen when I quit.
18     Q.   When you did what?
19     A.   When I left the department.
20     Q.   He just made this story up as well?
21     A.   I'm -- there may have been an
22 incident, but I'm not sure about the -- I don't
23 remember the incident.

Page 278

1     Q.   Okay.
2          MR. RICE:  All right.  Let's take a
3 five-minute break.
4          VIDEOGRAPHER:  We'll go off the
5 record.  The time is 1:35 p.m.
6          (Whereupon, a brief recess was
7 taken.)
8          VIDEOGRAPHER:  We'll go back on the
9 record.  The time is 1:42 p.m.
10     Q.   (BY MR. RICE:)  All right, Mr.
11 McLemore.  You said you're no longer employed
12 with the Department of Corrections, right?
13     A.   No, sir.
14     Q.   Why not?
15     A.   I took a job where I would be home
16 more.
17     Q.   You took a job where you would be
18 home more?
19     A.   Yes.
20     Q.   That's the only reason?
21     A.   Yes.
22     Q.   Earlier you stated that when you were
23 a kid, you wanted to grow up and be a

Page 279

1 correctional officer, right?
2     A.   That was one of my dreams, yes.  Some
3 type of law enforcement.
4     Q.   You gave up on that dream?
5     A.   Yes.  I moved on to other dreams.
6     Q.   Such as what?
7     A.   Coal mining.
8     Q.   Do you remember what date -- what was
9 your last date of employment with the Department
10 of Corrections?
11     A.   It was either January or February of
12 this year.
13     Q.   Let me mark this personnel file as
14 Plaintiff's Exhibit 4.
15          (Plaintiff's Exhibit 4 was marked for
16 identification and a copy of same is attached
17 hereto.)
18     Q.   Do you recognize this letter from
19 your personnel file?
20     A.   Yes.
21     Q.   Did you write that letter?
22     A.   Yes, I did.
23     Q.   What is it?  What does it state?

Page 280

1     A.   This is my resignation letter.
2     Q.   And what does it say was your
3 effective date of your resignation?
4     A.   February 23rd of '21.
5     Q.   Okay.  And in that resignation
6 letter, did you say you were leaving your job so
7 you could have more time with your family?
8     A.   Yes, I did.
9     Q.   And is your testimony today that
10 there were no other factors that contributed to
11 your decision to leave your employment with the
12 Department of Corrections?
13     A.   Yes, that's correct.
14     Q.   The dangerous work environment didn't
15 have anything to do with it?
16     A.   Of course it had an extent to do with
17 it.  But, I mean, everything is dangerous.
18     Q.   But you left your quote/unquote
19 dangerous job for a more dangerous job, didn't
20 you?
21     A.   No.  The job that I left for was
22 building modular homes.
23     Q.   Okay.  What happened with that job?

EXHIBIT C

# Deposition of Joe Binder

November 4, 2021

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://www.youtube.com/
watch?v=5brxqM6VubI

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ALABAMA

3         SOUTHERN DIVISION

4

5   CIVIL ACTION NUMBER:  2:19-cv-00899-LCS-SGC

6

7   DEMARCUS COLEMAN,

8        Plaintiff,

9        vs.

10  CORRECTIONAL OFFICER ZACKERY MCLEMORE, ET AL.,

11       Defendants.

12

13

14

15

16       VIDEOTAPED DEPOSITION

17            OF

18         JOE BINDER

19       November 4, 2021

20

21

22

23  REPORTED BY:  HOLLY M. HYATT, CCR

Page 2

1        STIPULATIONS

2

3        IT IS STIPULATED AND AGREED by and between

4   the parties through their respective counsel, that

5   the deposition of JOE BINDER may be taken before

6   Holly M. Hyatt, Commissioner, at the offices of The

7   Rice Firm, LLC, 115 Richard Arrington, Jr. Boulevard

8   North, Birmingham, Alabama, on November 4, 2021.

9

10       IT IS FURTHER STIPULATED AND AGREED that

11  the signature to and the reading of the deposition by

12  the witness is waived, the deposition to have the

13  same force and effect as if full compliance had been

14  had with all laws and rules of Court relating to the

15  taking of depositions.

16

17

18

19

20

21

22

23

Page 3

1        STIPULATIONS

2        (Continued)

3

4        IT IS FURTHER STIPULATED AND AGREED that it

5   shall not be necessary for any objections except as

6   to form or leading questions, and that counsel for

7   the parties may make objections and assign grounds at

8   the time of the trial, or at the time said deposition

9   is offered in evidence or prior thereto.

10

11       IT IS FURTHER STIPULATED AND AGREED that

12  the notice of filing of the deposition by the

13  Commissioner is waived.

14

15

16

17

18

19

20

21

22

23

Page 4

1        APPEARANCES

2

3   APPEARING ON BEHALF OF THE PLAINTIFF:

4

5   The Rice Firm, LLC
    Mr. Richard A. Rice
6   115 Richard Arrington Jr. Boulevard North
    Birmingham, Alabama 35203
7   (205) 618-8733
    rrice@rice-lawfirm.com
8

9

10  APPEARING ON BEHALF OF THE DEFENDANTS:

11

12  Office of the Attorney General
    Mr. J. Matt Bledsoe
13  State of Alabama
    501 Washington Avenue
14  Montgomery, Alabama 36130
    (334) 242-7300
15  matt.bledsoe@AlabamaAG.gov

16

17  ALSO PRESENT:

18    Mr. Taylor Holland, Videographer

19

20

21

22

23

Page 5

```
1              I N D E X
2                         PAGE:
3
4         INDEX OF EXAMINATIONS
5
6  Examination By Mr. Rice              7
7
8         INDEX OF EXHIBITS
9
10 Plaintiff's Exhibit 1  Personnel File      94
11 Plaintiff's Exhibit 2  Aerial Photograph   126
12 Plaintiff's Exhibit 3  Drawing             132
13 Plaintiff's Exhibit 4  Drawing             150
14 Plaintiff's Exhibit 5  Incident Report     162
15 Plaintiff's Exhibit 6  Affidavit of Binder 162
16 Plaintiff's Exhibit 7  Use of Force Report 175
17 Plaintiff's Exhibit 8  Knabenshue Complaint 193
18 Plaintiff's Exhibit 9  Wilson Complaint    206
19 Plaintiff's Exhibit 10  Hill Complaint     208
20 Plaintiff's Exhibit 11  Stout Complaint    214
21 Plaintiff's Exhibit 12  King Complaint     219
22 Plaintiff's Exhibit 13  Gregory Hill       223
23 Complaint
```

Page 6

```
1          I, Holly M. Hyatt, CCR, a Court Reporter
2  and Notary Public of the State of Alabama, acting as
3  Commissioner, do certify that on this date, as
4  provided by the Alabama Rules of Civil Procedure and
5  the foregoing stipulation of counsel, there came
6  before me at the offices of The Rice Firm, LLC, 115
7  Richard Arrington, Jr. Boulevard North, Birmingham,
8  Alabama, on November 4, 2021, beginning at 9:21 a.m.,
9  JOE BINDER, witness in the above cause for oral
10 examination, whereupon the following proceedings were
11 had:
12         THE VIDEOGRAPHER:  All right.  Good
13 morning.  Today is November 4th, 2021.  The time is
14 9:21 a.m.  My name is Taylor Holland.  I'm here on
15 behalf of Cite Court Reporting of Montgomery,
16 Alabama.
17         This is the deposition of
18 Mr. Joe Binder which was noticed by attorney Richard
19 Rice for the case Coleman v. McLemore, et al.
20 Counsel, please identify yourselves for
21 the record starting with the plaintiff.
22         MR. RICE:  Richard Rice on behalf of
23 the plaintiff, Demarcus Coleman.
```

Page 7

```
1          MR. BLEDSOE:  Matt Bledsoe on behalf of
2  the defendants.
3          THE VIDEOGRAPHER:  All right.  And will
4  the court reporter please administer the oath to the
5  witness?
6
7               JOE BINDER,
8  being first duly sworn, was examined and testified as
9  follows:
10
11         THE COURT REPORTER:  Usual
12 stipulations?
13         MR. RICE:  It's fine with me.
14         MR. BLEDSOE:  Yes.
15
16 EXAMINATION BY MR. RICE:
17     Q.    All right.  Good morning, Mr. Binder.
18 Could you please state your full name for the record?
19     A.    Joe L. Binder.
20     Q.    What does the L stand for?
21     A.    Initial.
22     Q.    I know, but what is your middle name,
23 sir?
```

Page 8

```
1      A.    L.
2      Q.    L?  Okay.  Can you spell it?
3      A.    L.  Initial.  That's it.  Just
4  initial.
5      Q.    I know, but you're not going to state
6  your full --
7      A.    Oh, I did.
8      Q.    -- first name?
9      A.    I did.  Joe.
10           Oh, you want me to spell it.  J-O-E,
11 middle initial L, last name Binder, B-I-N-D-E-R.
12 That's the truth.
13     Q.    Well, I understand that you
14 want -- your attorney told me that you want me to get
15 you out of here by 2:00 o'clock.
16     A.    Right.
17     Q.    And we already had a bit of a delay.
18 It's 9:22.
19     A.    Uh-huh.
20     Q.    Okay.  And I have an obligation to
21 represent my client's interest --
22     A.    Uh-huh.
23     Q.    -- just like Mr. Bledsoe has a
```

Page 53

1  Next time it's going to be put on paper which means
2  that it'll be written counsel.
3      Q.    And if the problem persists beyond that
4  written counseling, then what happens then?
5      A.    It's called progressive discipline.
6  It goes to the next level.
7      Q.    What's the next level?
8      A.    The next level will be a reprimand.
9  And then if you keep doing that after so many
10 times, it will go to maybe a day suspension.
11     Q.    And when were you promoted to sergeant?
12          You said 22 years after you started.
13 What -- around what year was that?
14     A.    March '20, I believe.  March --
15 March, April.
16     Q.    Of 2020?
17     A.    Right.
18     Q.    And what type of criteria are
19 considered for a promotion?
20     A.    I have no write-ups.  Take the test,
21 be in good standards with APOST.
22     Q.    Can you tell me a -- a little bit about
23 the test that you had to take to be promoted?

Page 54

1      A.    It's a written exam; A, B, C, D,
2  mathematical, that's pretty much it.
3      Q.    And so you need to be knowledgeable of
4  the ADOC policies and regulations?
5      A.    Yes.
6      Q.    Okay.  Do you recall what your base
7  salary was as a correctional officer?
8      A.    As a correctional officer?
9      Q.    Yes, sir.
10     A.    I'm thinking 49, 48,000.
11     Q.    Uh-huh.  And how would you describe the
12 benefits package?
13     A.    It was -- it was decent.
14     Q.    And what type of raise did you receive
15 upon becoming a sergeant?
16     A.    I think it was maybe about a 5 or
17 $6,000 raise.
18     Q.    How much overtime did you typically
19 work?
20     A.    25 a week.
21     Q.    And you said you really didn't have a
22 choice in that, did you?
23     A.    Not really.

Page 55

1      Q.    Do you think that was a problem that
2  you were required to work overtime?
3      A.    Well, if you a team player -- like
4  with me, I'm a team player.  If they ask me, I'm
5  coming.  If another officer got something they need
6  to do, I'm coming.
7      Q.    So your loyalty was to your colleagues
8  and the other officers.  You wanted to be there for
9  them?
10     A.    No, the loyalty was to the State.
11 The State needed me.  If I don't come and the other
12 officer don't come, who is going to be on the
13 shift?
14     Q.    Do you think the State showed that same
15 type of loyalty to you?
16     A.    No.
17     Q.    How does that make you feel?
18     A.    Still have to come to work.
19     Q.    I know.  But how does it make you feel?
20     A.    Make me feel pissed sometime.  But
21 still got to have a job.
22     Q.    Do you feel taken advantage of?
23     A.    No.  I don't.  Because I've been

Page 56

1  working it for so long -- working it so long and
2  this is what I been doing for so long.  So say you
3  come -- need to come in, I'm coming in, but at the
4  same --
5      Q.    So --
6      A.    Say again?
7      Q.    I didn't mean to interrupt you.  You go
8  ahead.
9      A.    I'm just saying, you know, if you
10 don't come to work, you put more pressure on the
11 rest of the shift.  And as a team, that's what
12 needs to take place.
13     Q.    So do you think this was a burden
14 that's your burden to carry and you're just going to
15 do what you have to do?
16     A.    I've been doing it for 22, 23 years.
17     Q.    Can you tell me about some of the
18 training you received when you first started as a
19 correctional officer?
20     A.    Welcomes training, medical training,
21 the use of force -- lots more training.  Don't
22 remember it.
23     Q.    Uh-huh.  And what was the last training

Page 165

1  and assisted to his feet.  Inmate Coleman was
2  escorted to the infirmary for medical attention and
3  decontamination."
4      Q.    That's your affidavit?
5      A.    Yeah.
6      Q.    You wrote that?
7      A.    Uh-huh.
8      Q.    Is that the same thing you just told me
9  today?
10     A.    Pretty much.
11     Q.    Pretty much but not exactly, right?
12     A.    Correct.
13     Q.    Okay.  And you said that you -- you
14  noticed that Coleman was in an aggressive stance?
15     A.    Right.
16     Q.    What does that mean?
17     A.    That means standing in a box stance.
18     Q.    A box stance?
19     A.    Like shoulder -- shoulder
20  width -- feet shoulder-width apart.
21     Q.    Do you feel threatened if you see a man
22  standing in front of you with his feet under his
23  shoulders?

Page 166

1      A.    Yeah.  If he's standing in boxer
2  stand with his hands clenched and making the -- the
3  audible things that he was speaking, yes.
4      Q.    Was it -- was those audible
5  things -- you consider those things he was speaking
6  to be a threat or to be threatening?
7      A.    Well, he was making a threat towards
8  an officer.
9      Q.    And you took him seriously at that
10  point where he says he's going to -- he wants
11  to -- wanted the white boy one-on-one?
12     A.    I kind of thought it was -- I kind of
13  thought he was crazy.
14     Q.    Because Big G was there too, right?
15     A.    Right.  He was there too.
16     Q.    And you were there too?
17     A.    I was there.
18     Q.    Under what circumstances would you
19  allow an inmate to challenge an officer to a
20  one-on-one fight?
21     A.    It wasn't that it was allowed, it was
22  something that he acted on.  Because if I was put
23  in his position and they told me to get back in the

Page 167

1  cell, I would have never came out the cell.
2      Q.    I know.  But I -- don't you -- aren't
3  you saying two different things at one time right
4  now?
5          Because the reason why I'm asking you
6  that question is this, you said he acted on it.  How
7  did he act on what he was saying?
8      A.    He attempted to swing.
9      Q.    He attempted to swing first before any
10  force was used against him?
11     A.    Right.
12     Q.    That's not what you said, though, is
13  it?
14     A.    Yeah.
15     Q.    And when he attempted to swing on him,
16  how close was he to McLemore at that point?
17     A.    McLemore was standing in front of the
18  door --
19     Q.    And he swung at --
20     A.    And the door -- the door -- McLemore
21  like this here (indicating), and he tried to swing
22  on Moore but Moore would -- I mean, McLemore was
23  still in front of the door at the two and a half --

Page 168

1  you know, the swing.
2      Q.    Uh-huh.
3      A.    Big G would have been to his left.  I
4  would have been to his left.
5      Q.    He swung and he missed?
6      A.    I don't know if he connected or not.
7      Q.    Yeah.  Because in your statement, you
8  said he -- he attempted to swing on Officer McLemore?
9      A.    Right.  But I say, I don't know if he
10  connected or not.
11     Q.    And when you say attempted to swing, it
12  kind -- it could mean different things if I'm really
13  just thinking about it because --
14     A.    He went through the motion.
15     Q.    So that's not an attempted swing.  It
16  is a swing then, right?  It's a swing and a miss?
17     A.    Attempted swing.  Okay.
18     Q.    Is that right?
19     A.    Yeah.
20     Q.    So he did swing?
21     A.    Right.
22     Q.    But he didn't make contact?
23     A.    Right.  But that don't mean it wasn't

EXHIBIT D

# Deposition of Shannon Caldwell

February 8, 2022

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://vimeo.com/
688555512/73df9826bb

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ALABAMA

3                    SOUTHERN DIVISION

4

5    CASE NUMBER:  2:19-cv-00899-LSC-SGC

6

7    DEMARCUS COLEMAN,

8            Plaintiff,

9         vs.

10   CORRECTIONAL OFFICER ZACHARY MCLEMORE, et al.,

11           Defendants.

12

13

14

15

16            VIDEOTAPED ZOOM DEPOSITION

17                      OF

18              SHANNON CALDWELL

19              February 8, 2022

20

21

22

23   REPORTED BY:  HOLLY M. HYATT, CCR

Shannon Caldwell                                    2/8/2022
                                                        2

1                S T I P U L A T I O N S

2

3              IT IS STIPULATED AND AGREED by and between

4      the parties through their respective counsel, that

5      the deposition of SHANNON CALDWELL may be taken

6      before Holly M. Hyatt, Commissioner, via Zoom

7      Videoconference from various locations in Alabama on

8      February 8, 2022.

9

10             IT IS FURTHER STIPULATED AND AGREED that

11     the signature to and the reading of the deposition by

12     the witness is waived, the deposition to have the

13     same force and effect as if full compliance had been

14     had with all laws and rules of Court relating to the

15     taking of depositions.

16

17

18

19

20

21

22

23

```
1              S T I P U L A T I O N S

2                      (Continued)

3

4           IT IS FURTHER STIPULATED AND AGREED that it

5    shall not be necessary for any objections except as

6    to form or leading questions, and that counsel for

7    the parties may make objections and assign grounds at

8    the time of the trial, or at the time said deposition

9    is offered in evidence or prior thereto.

10

11          IT IS FURTHER STIPULATED AND AGREED that

12   the notice of filing of the deposition by the

13   Commissioner is waived.

14

15

16

17

18

19

20

21

22

23
```

```
 1                    A P P E A R A N C E S

 2

 3      APPEARING ON BEHALF OF THE PLAINTIFF:

 4

 5        The Rice Firm, LLC
          Mr. Richard A. Rice
 6        115 Richard Arrington Jr. Boulevard North
          Birmingham, Alabama 35203
 7        (205) 618-8733
          rrice@rice-lawfirm.com
 8

 9

10      APPEARING ON BEHALF OF THE DEFENDANTS:

11

12        Office of the Attorney General
          Mr. J. Matt Bledsoe
13        State of Alabama
          501 Washington Avenue
14        Montgomery, Alabama 36130
          {334} 242-7300
15        matt.bledsoe@AlabamaAG.gov

16

17      ALSO PRESENT:

18         Mr. Taylor Holland, Videographer

19

20

21

22

23
```

Shannon Caldwell                                      2/8/2022
                                                            5

```
 1                    I N D E X

 2                                              PAGE:

 3

 4                INDEX OF EXAMINATIONS

 5

 6   Examination By Mr. Rice                      7

 7

 8

 9                INDEX OF EXHIBITS

10
```

```
11   Plaintiff's Exhibit 1  4/19 DOJ Findings    68

12   Plaintiff's Exhibit 2  Ashley Photo         74

13   Plaintiff's Exhibit 3  Coleman Photo        73

14   Plaintiff's Exhibit 4  Use of Force Report  77

15   Plaintiff's Exhibit 5  Coleman Side Photo   100

16   Plaintiff's Exhibit 7  Hot Bay Incidents    121

17   Plaintiff's Exhibit 8  7/20 DOJ Findings    131

18   Plaintiff's Exhibit 9  Steven Davis Photo   128

19        *Exhibit 6 was not mentioned or marked.
```

```
20

21

22

23
```

Shannon Caldwell                                           2/8/2022
                                                                  6

```
 1              I, Holly M. Hyatt, CCR, a Court Reporter

 2    and Notary Public of the State of Alabama, acting as

 3    Commissioner, do certify that on this date, as

 4    provided by the Alabama Rules of Civil Procedure and

 5    the foregoing stipulation of counsel, there came

 6    before me via Zoom videoconference from various

 7    locations in Alabama on February 8, 2022, beginning

 8    at 1:52 p.m., SHANNON CALDWELL, witness in the above

 9    cause for oral examination, whereupon the following

10    proceedings were had:

11              THE VIDEOGRAPHER:  All right.  We're

12    gonna go on the record.  The date is February 8th,

13    2022.  The time is 1:52 p.m. Central standard.

14              My name is Taylor Holland.  I'm here on

15    behalf of Cite Court Reporting of Montgomery,

16    Alabama.  This is the deposition of Mr. Shannon

17    Caldwell, which was noticed by attorney Richard Rice

18    for the case Coleman V McLemore, et al.

19              Counsel, please identify yourselves for

20    the record starting with the plaintiff.

21              MR. RICE:  Richard Rice for the

22    plaintiff.

23              MR. BLEDSOE:  Matt Bledsoe for the
```

```
1    defendants, Binder, McLemore, and Gadson.

2                 THE VIDEOGRAPHER:  Thank you.

3                 And will the court reporter please

4    administer the oath to the witness?

5

6                 SHANNON CALDWELL,

7    having been first duly sworn, was examined and

8    testified as follows:

9

10                THE COURT REPORTER:  Usual

11   stipulations?

12                MR. RICE:  Yes.

13                MR. BLEDSOE:  Yes.

14

15   EXAMINATION BY MR. RICE:

16        Q.     Okay.  Captain Caldwell -- is it

17   captain?

18        A.     Yes, sir.

19        Q.     Okay.  Thank you.  My name is Richard

20   Rice.  I'm an attorney for DeMarcus Coleman.  And I

21   guess are you the only person in the room right now?

22        A.     I am.  I am.

23        Q.     Okay.  Do you mind removing your mask,
```

1    that you followed to become a correctional officer.

2           A.      Needed a job, put an application in

3    because my cousin said they was hiring, and I been

4    here ever since.

5           Q.      Okay.  And when did you start?

6           A.      September 16th, 2002.

7           Q.      Okay.  And why did you want to become a

8    correctional officer?

9           A.      I needed a job.

10          Q.      How much longer do you plan to work for

11   the Department of Corrections?

12          A.      Five years.

13          Q.      And why five years?

14          A.      Because I got 20 years now, and I can

15   right retire with 25 years retirement.

16          Q.      Okay.  What are you planning to do

17   next?

18          A.      I don't know.

19          Q.      Okay.  How many other prisons have

20   you -- how many prisons have you been assigned to?

21          A.      Four.

22          Q.      Okay.  Tell me what prisons.

23          A.      St. Clair.

1    second paragraph as well.  Do you agree with that?

2         A.     April 15th, correct.

3         Q.     Okay.  April 15th.  Okay.  And then it

4    says that a month later, May 15th, 2019, at

5    10:08 p.m., I guess were you -- you were there in

6    your office at that time, and that's when you

7    determined that the use of force was justified and

8    reasonable; is that right?

9         A.     Yes, sir.  It's not finished.  That's

10   when the investigation was completed, and I was

11   able to put the information into the system.

12        Q.     And do you know when you started the

13   investigation?

14        A.     I -- I can't say exactly, but it was

15   probably two days before it was inputted to make

16   sure I got everybody seen.  So no -- so probably

17   the 13th I started it.

18        Q.     You probably started the investigation

19   on May 13th?

20        A.     That's what I'm saying, yeah.

21        Q.     So you waited almost 30 days to start

22   the investigation, and then the investigation lasted

23   two days, right?

1              MR. BLEDSOE:  Object to the form.

2         A.      You say I waited 30 -- that's date I

3    got to this incident report to deal with this use

4    of force.

5         Q.      (BY MR. RICE:)  And when I say when did

6    you start the investigation, when did you first begin

7    to speak to witnesses, speak to the officer, speak to

8    the inmate?  When did you start that process?

9         A.      It was probably, like I said, on May

10   the 13th, probably two days before this was

11   inputted into the system.  I don't know exactly.

12        Q.      Why do you say it was probably

13   May 13th?

14        A.      Because like I said, you know,

15   just -- justifying just saying -- just saying, hey,

16   probably two days to take care of an incident

17   report, just to make sure I've got the inmates and

18   the officers to my office to make sure I've seen

19   everybody.

20              Because I don't know if the officer

21   was off.  I don't know if they was at work that

22   day, off that day, to make sure that I got to

23   everybody, so it probably would take two days to

Shannon Caldwell                                           2/8/2022
                                                                94

```
 1    make sure that everybody involved with the incident

 2    was seen.

 3          Q.        Why would you wait until May 13 to

 4    investigate an incident that occurred on April 15th?

 5          A.        Probably because I had other details

 6    to do during that time.  I mean it -- you know, it

 7    just fell on that time.  That's when I got to that

 8    on the priority list.

 9                    You know, I had this use of force

10    needed to be conducted, and I got to it at that

11    time.

12          Q.        It wasn't really a priority for you, is

13    that what you're telling me?

14          A.        That's not what I --

15                    MR. BLEDSOE:  Object to the form.

16          A.        What I'm saying is that things go on

17    at the institution and it may be some other use of

18    force that came before that one.  And also, that we

19    have other things that's going on at the

20    institution where I wasn't able to get to

21    the -- that use of force at the time.

22          Q.        (BY MR. RICE:)  And do you -- in your

23    opinion, do you think that you may be able to conduct
```

EXHIBIT E

# Deposition of George Adams

February 8, 2022

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://vimeo.com/
688542232/7eb3b9023d

George Adams                                           2/8/2022
                                                            1

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5   CASE NUMBER:  2:19-cv-00899-LSC-SGC

6

7   DEMARCUS COLEMAN,

8           Plaintiff,

9       vs.

10  CORRECTIONAL OFFICER ZACHARY MCLEMORE, et al.,

11          Defendants.

12

13

14

15

16           VIDEOTAPED ZOOM DEPOSITION

17                    OF

18               GEORGE ADAMS

19             February 8, 2022

20

21

22

23  REPORTED BY:  HOLLY M. HYATT, CCR

George Adams                                          2/8/2022
                                                           2

```
 1              S T I P U L A T I O N S

 2

 3          IT IS STIPULATED AND AGREED by and between

 4   the parties through their respective counsel, that

 5   the deposition of GEORGE ADAMS may be taken before

 6   Holly M. Hyatt, Commissioner, via Zoom

 7   Videoconference from various locations in Alabama on

 8   February 8, 2022.

 9

10          IT IS FURTHER STIPULATED AND AGREED that

11   the signature to and the reading of the deposition by

12   the witness is waived, the deposition to have the

13   same force and effect as if full compliance had been

14   had with all laws and rules of Court relating to the

15   taking of depositions.

16

17

18

19

20

21

22

23
```

```
1              S T I P U L A T I O N S

2                    (Continued)

3

4         IT IS FURTHER STIPULATED AND AGREED that it

5    shall not be necessary for any objections except as

6    to form or leading questions, and that counsel for

7    the parties may make objections and assign grounds at

8    the time of the trial, or at the time said deposition

9    is offered in evidence or prior thereto.

10

11        IT IS FURTHER STIPULATED AND AGREED that

12   the notice of filing of the deposition by the

13   Commissioner is waived.

14

15

16

17

18

19

20

21

22

23
```

George Adams                                    2/8/2022
                                                      4

```
 1                A P P E A R A N C E S

 2

 3    APPEARING ON BEHALF OF THE PLAINTIFF:

 4

 5       The Rice Firm, LLC
         Mr. Richard A. Rice
 6       115 Richard Arrington Jr. Boulevard North
         Birmingham, Alabama 35203
 7       (205) 618-8733
         rrice@rice-lawfirm.com
 8

 9

10    APPEARING ON BEHALF OF THE DEFENDANTS:

11

12       Office of the Attorney General
         Mr. J. Matt Bledsoe
13       State of Alabama
         501 Washington Avenue
14       Montgomery, Alabama 36130
         {334} 242-7300
15       matt.bledsoe@AlabamaAG.gov

16

17    ALSO PRESENT:

18        Mr. Taylor Holland, Videographer

19

20

21

22

23
```

George Adams                                             2/8/2022
                                                              5

```
 1                    I N D E X

 2                                              PAGE:

 3

 4              INDEX OF EXAMINATIONS

 5

 6   Examination By Rice                          7

 7   Examination By Mr. Bledsoe                   89

 8

 9

10

11              INDEX OF EXHIBITS

12

13   Plaintiff's Exhibit 1  Aerial View Photo    34

14   Plaintiff's Exhibit 2  DOJ Investigative     45

15   Findings, First Installment

16   Plaintiff's Exhibit 3   Coleman Photo        58

17   Plaintiff's Exhibit 4   Coleman Statement    60

18   Plaintiff's Exhibit 5   7/23/20 DOJ Report   70

19

20

21

22

23
```

1            I, Holly M. Hyatt, CCR, a Court Reporter

2    and Notary Public of the State of Alabama, acting as

3    Commissioner, do certify that on this date, as

4    provided by the Alabama Rules of Civil Procedure and

5    the foregoing stipulation of counsel, there came

6    before me via Zoom videoconference from various

7    locations in Alabama on February 8, 2022, beginning

8    at 9:38 a.m., GEORGE ADAMS, witness in the above

9    cause for oral examination, whereupon the following

10   proceedings were had:

11            THE VIDEOGRAPHER:  All right.  We're

12   gonna go on the record.  The date is February 8th,

13   2022.  The time is 9:38 a.m. Central standard.  My

14   name is Taylor Holland.  I'm here on behalf of Cite

15   Court Reporting in Montgomery, Alabama.

16            This is the deposition of Mr. George

17   Adams which was noticed by attorney Richard Rice for

18   the case Coleman V McLemore, et al.

19            Counsel, please identify yourselves for

20   the record starting with the plaintiff.

21            MR. RICE:  Richard Rice on behalf of

22   Mr. DeMarcus Coleman.

23            MR. BLEDSOE:  Matt Bledsoe on behalf of

```
 1    the defendants.

 2                   THE VIDEOGRAPHER:  Thank you.

 3                   Will the court reporter please

 4    administer the oath to the witness?

 5

 6                   GEORGE ADAMS,

 7    being first duly sworn, was examined and testified as

 8    follows:

 9

10                   THE COURT REPORTER:  Usual

11    stipulations?

12                   MR. BLEDSOE:  Yes.

13                   MR. RICE:  That's fine.

14

15    EXAMINATION BY RICE:

16         Q.    All right.  Mr. Adams, my name is

17    Richard Rice as I just stated, representing

18    Mr. Coleman.  Is this your first time participating

19    in a deposition?

20         A.    No.

21         Q.    Okay.  All right.

22         A.    I mean, regarding --

23         Q.    Go ahead.
```

George Adams                                    2/8/2022
                                                      74

```
 1        Q.      Well, what about (audio cutout) -- did

 2   you know him?

 3                THE REPORTER:  I lost your question

 4   again, Mr. Rice.

 5        Q.      Chaplain, did you know Officer

 6   McLemore?

 7        A.      Yes.

 8        Q.      Did you have a personal relationship

 9   with him?

10        A.      No.  Other than just passing and

11   sometimes going into the blocks when I conducted

12   classes or so in there.

13        Q.      Did Officer McLemore have any type of

14   reputation that you were aware of?

15                MR. BLEDSOE:  Object to the form.

16        A.      Other than, yeah, hearing inmates say

17   that, you know, he -- he was one of those

18   individuals.  Yeah.

19        Q.      (BY MR. RICE:)  "One of those

20   individuals," that would be what, sir?

21        A.      That may have used force.

22        Q.      Used excessive force, was that -- was

23   that what the inmates said?
```

```
 1                    MR. BLEDSOE:  Object to the form.

 2         A.      Yes, uh-huh.

 3         Q.      (BY MR. RICE:)  And did you know

 4  Officer Binder?

 5         A.      Yes.

 6         Q.      And you stated that Officer Binder also

 7  had a reputation for using excessive force?

 8         A.      Yes.

 9         Q.      Did you know an Officer Speaks?

10         A.      I -- I vaguely remember him.  Speaks,

11  Speaks, Speaks.  I don't know that he was in

12  the -- around long enough for me to -- I just can't

13  picture him right now at the moment or recall him.

14         Q.      Are you aware that Officer Gadson,

15  Officer McLemore, and Binder have been sued numerous

16  times for excessive force?

17                    MR. BLEDSOE:  Object to the form.

18         A.      No.

19         Q.      (BY MR. RICE:)  Okay.  Would it

20  surprise you if I told you they were -- they have

21  been sued numerous times for excessive force?

22         A.      No.

23         Q.      Have you ever heard of Officer Binder
```

EXHIBIT F

# Deposition of David Bucher

February 8, 2022

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://vimeo.com/
688551051/ca32f573b7

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE NORTHERN DISTRICT OF ALABAMA

 3                  SOUTHERN DIVISION

 4

 5   CASE NUMBER:  2:19-cv-00899-LSC-SGC

 6

 7   DEMARCUS COLEMAN,

 8          Plaintiff,

 9      vs.

10   CORRECTIONAL OFFICER ZACHARY MCLEMORE, et al.,

11          Defendants.

12

13

14

15

16          VIDEOTAPED ZOOM DEPOSITION

17                  OF

18              DAVID BUCHER

19            February 8, 2022

20

21

22

23   REPORTED BY:  HOLLY M. HYATT, CCR
```

Cite, LLC

David Bucher                                            2/8/2022
                                                            2

```
 1              S T I P U L A T I O N S

 2

 3          IT IS STIPULATED AND AGREED by and between

 4    the parties through their respective counsel, that

 5    the deposition of DAVID BUCHER may be taken before

 6    Holly M. Hyatt, Commissioner, via Zoom

 7    Videoconference from various locations in Alabama on

 8    February 8, 2022.

 9

10          IT IS FURTHER STIPULATED AND AGREED that

11    the signature to and the reading of the deposition by

12    the witness is waived, the deposition to have the

13    same force and effect as if full compliance had been

14    had with all laws and rules of Court relating to the

15    taking of depositions.

16

17

18

19

20

21

22

23
```

David Bucher                                           2/8/2022
                                                              3

```
 1                 S T I P U L A T I O N S

 2                      (Continued)

 3

 4           IT IS FURTHER STIPULATED AND AGREED that it

 5    shall not be necessary for any objections except as

 6    to form or leading questions, and that counsel for

 7    the parties may make objections and assign grounds at

 8    the time of the trial, or at the time said deposition

 9    is offered in evidence or prior thereto.

10

11           IT IS FURTHER STIPULATED AND AGREED that

12    the notice of filing of the deposition by the

13    Commissioner is waived.

14

15

16

17

18

19

20

21

22

23
```

```
1                   A P P E A R A N C E S

2


3     APPEARING ON BEHALF OF THE PLAINTIFF:

4


5        The Rice Firm, LLC
         Mr. Richard A. Rice
6        115 Richard Arrington Jr. Boulevard North
         Birmingham, Alabama 35203
7        (205) 618-8733
         rrice@rice-lawfirm.com
8


9


10    APPEARING ON BEHALF OF THE DEFENDANTS:

11


12       Office of the Attorney General
         Mr. J. Matt Bledsoe
13       State of Alabama
         501 Washington Avenue
14       Montgomery, Alabama 36130
         {334} 242-7300
15       matt.bledsoe@AlabamaAG.gov

16


17    ALSO PRESENT:

18        Mr. Taylor Holland, Videographer

19


20


21


22


23
```

David Bucher                                            2/8/2022
                                                             5

```
 1                    I N D E X

 2                                           PAGE:

 3

 4              INDEX OF EXAMINATIONS

 5

 6   Examination By Mr. Rice                    7

 7   Examination By Mr. Bledsoe                 63

 8

 9

10              INDEX OF EXHIBITS

11

12   Plaintiff's Exhibit 3  Coleman Photo      41

13   Plaintiff's Exhibit 4  Coleman Statement  42

14   Plaintiff's Exhibit 5  7/20 DOJ Findings  48

15

16

17

18

19

20

21

22

23
```

1           I, Holly M. Hyatt, CCR, a Court Reporter

2    and Notary Public of the State of Alabama, acting as

3    Commissioner, do certify that on this date, as

4    provided by the Alabama Rules of Civil Procedure and

5    the foregoing stipulation of counsel, there came

6    before me via Zoom videoconference from various

7    locations in Alabama on February 8, 2022, beginning

8    at 11:35 a.m., DAVID BUCHER, witness in the above

9    cause for oral examination, whereupon the following

10    proceedings were had:

11                THE VIDEOGRAPHER:  All right.  We're

12   going on the record.  The date is February 8th,

13   2022.  The time is 11:35 a.m. Central standard.  My

14   name is Taylor Holland.  I'm here on behalf of Cite

15   Court Reporting in Montgomery, Alabama.

16                This is the deposition of Mr. David

17   Bucher, which was noticed be attorney Richard Rice

18   for the case Coleman V. McLemore, et al.

19                Counsel, please identify yourselves for

20   the record starting with the plaintiff.

21                MR. RICE:  Richard Rice on behalf of

22   the plaintiff.

23                MR. BLEDSOE:  Matt Bledsoe on behalf of

1    the defendants.

2              THE VIDEOGRAPHER:  Thank you.  Will the

3    court reporter please administer the oath to the

4    witness?

5

6              DAVID BUCHER,

7    having been duly sworn, was examined and testified as

8    follows:

9

10             THE COURT REPORTER:  Usual

11   stipulations?

12             MR. RICE:  Yes.

13             MR. BLEDSOE:  Yes.

14

15   EXAMINATION BY MR. RICE:

16        Q.      Okay.  Mr. Bucher, my name is Richard

17   Rice.  As I stated, I'm an attorney representing

18   plaintiff DeMarcus Coleman who was formerly

19   incarcerated with the Department of Corrections.

20             And he's filed a lawsuit against the

21   Department of Corrections and several of their

22   employees.  And we have a -- I have a few questions

23   for you today.

```
 1                    If you could first, please state your

 2   name for the record.

 3           A.        David Bucher.

 4           Q.        Okay.  And are you currently taking any

 5   medication that will impact your ability to be honest

 6   or recall certain facts today?

 7           A.        No.  No, sir.

 8           Q.        Okay.  And could you tell me your date

 9   of birth?

10           A.        March 12, 1975.

11           Q.        Okay.  And what city were you born?

12           A.        I was born in Lebonay [phonetic],

13   Pennsylvania.

14           Q.        And just to take a step back, is this

15   your first time participating in a deposition as a

16   witness?

17           A.        Yes, sir.

18           Q.        Okay.  So just some of the basic ground

19   rules would be just one of us should be speaking at a

20   time.  We have a court reporter here who's

21   transcribing everything.

22                     If you don't understand a question,

23   just ask me to repeat it, and I'd be happy to do so.
```

1          A.      I -- there were some names that rose.

2     You know, they -- I come from a farming background.

3     The cream rises to the top.  This is not a good

4     cream though, but there were certain names that

5     rose to the top of the list, yes.

6          Q.      Do you recall those names?

7          A.      I would prefer not to just throw them

8     out here.

9          Q.      Okay.  Then what about Roger Gadson?

10         A.      I have a good working relationship

11    with Mr. Gadson.

12         Q.      Are you aware folks referring to Roger

13    Gadson as Big G?

14         A.      I have called him that myself.

15         Q.      And would it be safe to say Big G had a

16    reputation of using force and sometimes excessive

17    force?

18              MR. BLEDSOE:  Object to the form.

19         A.      He does have a reputation for that.

20         Q.      (BY MR. RICE:)  What about Officer

21    McLemore?

22         A.      I have --

23         Q.      Do you know --

```
 1          A.      I have a good working relationship

 2   with Officer McLemore.

 3          Q.      Okay.  And does Officer McLemore have a

 4   reputation for using excessive force?

 5                  MR. BLEDSOE:  Object to the form.

 6          A.      I have been told by inmates that he

 7   does have that reputation.  I have never witnessed

 8   it though.

 9          Q.      (BY MR. RICE:)  And Officer Binder.

10   Are you aware of Officer Binder having a reputation

11   for using excessive force?

12                  MR. BLEDSOE:  Object to the form.

13          A.      Officer Binder from my knowledge over

14   the years would be more on the de -- verbal

15   derogatory side.  He's just a little man.

16   He's -- he's a small man like me, but -- but he did

17   not have a good reputation among the inmates.  No,

18   he did not.

19          Q.      (BY MR. RICE:)  And Officer Binder was

20   in a supervisory role, right?

21          A.      Yes.  He was a sergeant.

22          Q.      He was a sergeant.  There we go.

23          A.      Yes.
```

David Bucher                                              2/8/2022
                                                              39

1    do remember is they might have been called the

2    crew.  But the kludge crew I do not remember.  No

3    one ever told me that specifically.

4          Q.      And do you know whether or not --

5                  Go ahead.

6          A.      I don't know if you were getting to

7    just plain crew or not, but I think I do remember

8    hearing something about the crew.

9          Q.      Okay.  All right.

10         A.      So...

11         Q.      Do you know whether or not the

12   Department of Corrections provides any type of

13   support to officers struggling with mental health

14   issues?

15         A.      I think it is available.  I don't

16   know any specifics -- yeah.  I believe it is

17   available.  And there is -- you may have heard

18   something about the CISM Committee, critical

19   incident stress management.

20                 There are a number of different staff

21   members on that committee that would be helpful to

22   things like this.  But -- yes.  I -- I think mental

23   health treatment would be available.  Whether it is

<u>EXHIBIT G</u>

Deposition link: https://vimeo.com/688203583/5be5e106fb
No transcript available.