FILED

2022 Mar-16  PM 05:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

EXHIBIT A

# Deposition of Roderick Gadson

November 1, 2021

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://www.youtube.com/
watch?v=ztFjAQCnz9U



Page 1

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF ALABAMA

3  SOUTHERN DIVISION

4

5  DEMARCUS COLEMAN,   )

6  PLAINTIFF,      )
                 )
7  Vs.          )CIVIL ACTION NO.
                 )2:19-cv-00899-LSC-SGC
8  CORRECTIONAL OFFICER )
   ZACHARY MCLEMORE,   )
9  Et al.,          )
                 )
10  DEFENDANTS.      )

11

12

13     * * * * * * * * * *

14

15     The deposition of RODERICK GADSON,

16  taken pursuant to stipulation and agreement

17  before Kaye Paulsen Ruiz, Certified Court

18  Reporter and Commissioner for the State of

19  Alabama at Large, at The Rice Firm, LLC, 115

20  Richard Arrington, Jr. Boulevard North,

21  Birmingham, Alabama 35203, on November 1,

22  2021, commencing at approximately 10:17 a.m.

23     * * * * * * * * * *

Page 2

1     APPEARANCES

2

3  ON BEHALF OF THE PLAINTIFF:

4  Richard A. Rice, Esq.
   THE RICE FIRM, LLC
5  115 Richard Arrington, Jr. Boulevard, N.
   Birmingham, AL 35203
6  (205)618-8733
   rrice@rice-lawfirm.com
7

8  ON BEHALF OF THE DEFENDANTS:

9  J. Matt Bledsoe, Esq.
   Assistant Attorney General
10  Office of the Attorney General
   501 Washington Avenue
11  Montgomery, AL 36130
   (334)242-7300
12  Matt.Bledsoe@AlabamaAG.gov

13  ALSO PRESENT:

14  Ms. Martrese Bell

15  Mr. Taylor Holland (Videographer)

16

17

18

19

20

21

22

23

Page 3

1     EXAMINATION INDEX

2  EXAMINATION BY:          PAGE

3   Mr. Rice          8

4

5     EXHIBIT INDEX

   PLAINTIFF'S
6  EXHIBIT NOS.  DESCRIPTION      PAGE

7  PX-1      Investigation report  289
   PX-2      Photograph
8  PX-3      Investigation report  301
   PX-5      Photograph        330
9  PX-6      Photograph        330
   PX-7      Incident report    356
10  PX-8      Investigative report  356
   PX-9      Affidavit        357
11  PX-10     Case list        400
   PX-11     Complaint        401
12  PX-12     Complaint        405
   PX-13     Complaint        421
13  PX-14     Photograph        435

14

15

16

17

18

19

20

21

22

23

Page 4

1     STIPULATIONS

2

3     IT IS STIPULATED AND AGREED that the

4  signature to and reading of the deposition

5  by the witness is waived, the deposition to

6  have the same force and effect as if full

7  compliance had been had with all laws and

8  rules of Court relating to the taking of

9  depositions.

10     IT IS FURTHER STIPULATED AND AGREED

11  that it shall not be necessary for any

12  objections to be made by counsel to any

13  questions, except as to form or leading

14  questions, and that counsel for the parties

15  may make objections and assign grounds at

16  the time of the trial, or at the time said

17  deposition is offered in evidence, or prior

18  thereto.

19     * * * * * * * * * *

20

21

22

23

Page 5

1        DEPOSITION

2

3        I, Kaye Paulsen Ruiz, a Court

4   Reporter of Birmingham, Alabama, and a

5   Notary Public for the State of

6   Alabama-at-Large, acting as Commissioner,

7   certify that on this date pursuant to

8   Alabama Rules of Civil Procedure and the

9   foregoing stipulations of counsel, there

10  came before me on the 1st day of November

11  2021, at The Rice Firm, LLC, 115 Richard

12  Arrington, Jr. Boulevard North, Birmingham,

13  Alabama 35203, commencing at approximately

14  10:17 a.m., RODERICK GADSON, witness in the

15  above cause, for oral examination, whereupon

16  the following proceedings were had:

17        THE VIDEOGRAPHER:  Good

18        morning.  Today is November

19        1st, 2021.  The time on the

20        monitor is 10:17 a.m.  My

21        name is Taylor Holland.

22        I'm here on behalf of Cite

23        Court Reporting in

Page 6

1        Montgomery, Alabama.  This

2        is the deposition of

3        Mr. Roderick Gadson which

4        was noticed by Richard Rice

5        for the case Coleman v.

6        McLemore, et al.  Counsel,

7        will you, please, identify

8        yourselves for the record

9        starting with the

10       Plaintiff.

11        MR. RICE:  Yeah.  Richard

12        Rice on behalf of Demarcus

13        Coleman.

14        MR. BLEDSOE:  Matt Bledsoe

15        on behalf of the

16        Defendants.

17        THE VIDEOGRAPHER:  Thank

18        you.  Will the court

19        reporter, please,

20        administer the oath to the

21        witness.

22   RODERICK GADSON, called as a witness,

23  after having first been duly sworn to speak

Page 7

1   the truth, the whole truth, and nothing but

2   the truth, was examined and testified as

3   follows:

4        THE REPORTER:  Usual

5        stipulations?

6        MR. RICE:  Yes.

7        EXAMINATION

8   BY MR. RICE:

9   Q.   All right.  Good morning, Mr. Gadson.

10       As previously stated, my name is

11       Richard Rice.  I'm the attorney for

12       Demarcus Coleman.  How are you doing

13       today?

14  A.   I'm all right.

15  Q.   Good, good.  And we just stated your

16       name for the record, so I can go ahead

17       and bypass that.  Is this your first

18       time being deposed?

19  A.   Huh-uh (indicating no).

20  Q.   Okay.  So one of the first things I

21       wanted to go over with you is that

22       obviously we are audio and video

23       recording, but we also have a court

Page 8

1   reporter here who will be transcribing

2   everything and so just to keep

3   everything clear and -- and clean, if

4   you will, it's better if you say yes or

5   no, as opposed to huh-uh or uh-huh or

6   head nods and things of that nature

7   just so we can have an exact record of

8   everything.  And, secondly, I would

9   just say if I ask you a question, if

10  you don't understand it, tell me and

11  I'll restate it, but if you do answer

12  the question, then I will assume that

13  you do understand the question.  Is

14  that fair?

15  A.   It is.

16  Q.   Okay.  And -- and some of these

17       questions is just background questions.

18       They're pretty standard.  So the first

19       thing I just want to ask you is are you

20       taking any type of medication today?

21  A.   Nope.

22  Q.   Okay.  So you haven't taken any

23       medication in the last 48 hours that

Page 21

1  your job?  Is that something you try to
2  leave there --
3  **A.  My job --**
4  Q.   -- at the facility and not bring home
5  to your kids or --
6  **A.  My job is -- It ain't -- It's**
7  **stressful, but it ain't to the point**
8  **where you fixing to take it home and**
9  **take it out on your family.**
10 Q.  Uh-huh (indicating yes).  What are
11 some of the things you do with your
12 kids?  Do they play sports?  Do you
13 participate in those type of activities
14 or what are some of the things you do?
15 **A.  Be a father.**
16 Q.  Uh-huh (indicating yes).  Any specific
17 examples of anything that you -- you
18 could share with me to let us know what
19 type of activities you share with your
20 kids?
21 **A.  Just be a father.**
22 Q.  Are you active in your community?
23 **A.  What do you mean active?**

Page 22

1  Q.  Well, I mean, do you participate in
2  any type of community events or are
3  you -- do you volunteer, provide any
4  services for -- for your community
5  maybe through your church or through
6  another organization?
7  **A.  No.  I work a lot.**
8  Q.  Okay.  And what about your parents,
9  were they involved in law enforcement?
10 What type of work do they do?
11 **A.  My dad was.**
12 Q.  He was?  Was he a police officer, a
13 correctional officer?
14 **A.  Police.**
15 Q.  Where?
16 **A.  In Birmingham.**
17 Q.  Birmingham Police.  Is he retired now?
18 **A.  He is.**
19 Q.  Okay.  What about your mom?
20 **A.  She did a lot of stuff.  She had a real**
21 **estate company.  She sold insurance.**
22 **She did a lot.**
23 Q.  Do you think your dad is proud of you

Page 23

1  because you kind of followed in his
2  footsteps?
3  **A.  Corrections and policing is totally**
4  **different.**
5  Q.  Why do you say that?
6  **A.  Because it is.**
7  Q.  It's law enforcement, right?
8  **A.  I mean, it's still totally different.**
9  Q.  How would you say it's different?
10 **A.  Because they deal with them when**
11 **they -- They deal with them when they**
12 **try -- when they arrest them.  I deal**
13 **with them for long -- long periods of**
14 **time.  They may see them one or two**
15 **times -- when they arrest them and when**
16 **they go to court for a trial.  I have**
17 **to see this person every day, so it's**
18 **totally different.**
19 Q.  So you develop more of a relationship
20 with the inmates than --
21 **A.  I ain't going to say a relationship.**
22 **It's a professional relationship.**
23 Q.  Of course.  Do you feel like your

Page 24

1  position as a correctional officer that
2  you have certain knowledge about
3  inmates that the general public
4  wouldn't -- wouldn't have?  Would you
5  agree with that?
6       MR. BLEDSOE:  Object to the
7       form.
8       THE WITNESS:  What do you
9       mean general knowledge?
10 BY MR. RICE:
11 Q.  Would you have -- I should probably
12 say do you believe -- Would you agree
13 that you have specific knowledge about
14 inmates that members of the general
15 public wouldn't have?
16 **A.  Like what?**
17      MR. BLEDSOE:  Object to the
18      form.
19 BY MR. BISHOP:
20 Q.  Anything.  Just --
21 **A.  No.  I don't look at they -- I've**
22 **always been -- In my 15 years of**
23 **service, I don't -- I don't look at**

Page 73

1 something.

2 Q.  How often did you, you know, have a

3 riot in the dorm?

4 **A.  I told you I never experienced that**

5 **when I was on the CERT team.**

6 Q.  Okay.  For five years, you never saw

7 one riot?

8 **A.  I ain't never seen a riot because, I**

9 **mean, a person that's seen a riot**

10 **probably wouldn't be here talking to**

11 **you.**

12 Q.  And what type of disturbances were you

13 called for as a member of the CERT

14 team?

15 **A.  When I was on the CERT team, the only**

16 **thing we was called for was searches.**

17 **I ain't never been in that type**

18 **situation where I've been in a big**

19 **disturbance or something like that or a**

20 **riot.**

21 Q.  Can you describe to me the process of

22 how you conduct a search as a member of

23 the CERT team?

Page 74

1           MR. BLEDSOE:  Object to the

2           form.

3           THE WITNESS:  I mean, you

4           search a bed.  You search

5           the inmate.  You pat them

6           down and you search his

7           property.

8 BY MR. RICE:

9 Q.  Do you secure the inmate before you

10 start searching the room or his cell?

11 **A.  It's different --**

12           MR. BLEDSOE:  Object to the

13           form.

14           THE WITNESS:  It just

15           depends.  It's different

16           situations.

17 BY MR. RICE:

18 Q.  So what is a situation in which you

19 would begin to search an inmate's cell

20 in which you first didn't secure the

21 inmate?

22 **A.  You said if the inmate is in -- If the**

23 **inmate is in general population, why**

Page 75

1 would I secure him?  I would make him

2 stand outside or -- I -- What I do is,

3 if I'm searching an inmate's cell, I,

4 like, have another -- If we have enough

5 officers, I have one -- one officer

6 stand out there with him or I stand out

7 there with him when the officer is

8 searching his cell so they can look and

9 see, so if you do find some contraband

10 or something, the inmate can't say,

11 "Well, okay, you put it on me."  That's

12 how I conduct it.

13 Q.  So you would first remove the inmate

14 from the cell?

15 **A.  Yeah, but he can stand outside the cell**

16 **and watch what the officers -- provide**

17 **security outside the cell.**

18 Q.  Would you put him in handcuffs first?

19 **A.  Why would I put him in handcuffs if**

20 **he's in general population?  Now, if**

21 **he's in restricted housing, he -- he**

22 **would be placed in handcuffs before he**

23 **comes out of the cell.**

Page 76

1 Q.  But if he's not in restricted housing,

2 he wouldn't be placed in handcuffs

3 first?

4 **A.  If he becomes -- if he becomes**

5 **disruptive or combative, he'll be --**

6 **he'll be -- I'll attempt to put him in**

7 **handcuffs.**

8 Q.  And what if he refuses to allow you to

9 handcuff him?

10 **A.  I mean, you probably will get a**

11 **disciplinary.  There ain't no way.**

12 Q.  If you had an inmate that was in

13 restrictive housing and you received a

14 call to search his cell and you went to

15 his cell and you attempted to place

16 handcuffs on him and he chose not to

17 allow you to handcuff him, what would

18 you do in that situation?

19 **A.  If he chose not to let me put handcuffs**

20 **on him?**

21 Q.  Or any of the other CERT members that

22 are with you.

23 **A.  I'm not on the CERT team.**

Roderick Gadson

1  Q.   I know, but when you were.

2  **A.   When I was on the CERT team?**

3  Q.   Yes.

4  **A.   I was -- I was an officer when I was on**

5  **the CERT team, so what I would do is I**

6  **would report it to a supervisor and**

7  **then I'd let the supervisor make the**

8  **decision on what he wanted -- he or she**

9  **wanted to do.**

10 Q.   And, typically, when you went to the

11 cell to conduct these searches, would

12 you not have a supervisor with you?

13 **A.   It just depends on who -- It just**

14 **depends. You don't have to have a**

15 **supervisor conduct the search. You**

16 **don't.**

17 Q.   So you would just stop the search and

18 ask the supervisor what you could do in

19 that situation?

20 **A.   It ain't stopping the search because**

21 **being in restricted house, the searches**

22 **never start because I just can't open**

23 **his door. I just can't open his door**

1  **and go in there. He has to be placed**

2  **in handcuffs first.**

3  Q.   Okay. I'll come back to that.

4  What -- what would you say is the most

5  challenging thing about your job today

6  as a lieutenant?

7  **A.   Shortage -- staff shortage.**

8  Q.   Staff shortages? Why is that

9  stressful?

10         MR. BLEDSOE: Object to the

11         form.

12 BY MR. RICE:

13 Q.   Or why is that challenging?

14 **A.   What you mean why is it challenging?**

15 Q.   Why is it challenging when you have a

16 staff shortage?

17 **A.   Because you still have to get stuff**

18 **done and you're short of staff. That's**

19 **why -- That's how it's challenging.**

20 Q.   So you have more responsibilities than

21 you, otherwise, would?

22 **A.   As a supervisor?**

23 Q.   As a supervisor, yes.

1  **A.   Of course you're going to have more**

2  **responsibility.**

3  Q.   Okay. And if I ask you questions that

4  just seem silly or obvious, I'm not the

5  witness. I'm only the attorney, so I

6  can't -- I can't give testimony.

7  **A.   I understand. I don't take it**

8  **personal.**

9  Q.   Okay.

10 **A.   I don't take nothing personal.**

11 Q.   Okay. What do you think that the

12 prison system can do to reduce some of

13 that -- those challenges that you just

14 mentioned?

15         MR. BLEDSOE: Object to the

16         form.

17         THE WITNESS: Hire more

18         people.

19 BY MR. RICE:

20 Q.   And what about incarcerate fewer

21 people?

22         MR. BLEDSOE: Object to the

23         form.

1          THE WITNESS: I ain't -- I

2          can't --

3  BY MR. RICE:

4  Q.   I mean --

5  **A.   I'm not at judge. I'm not a DA. I**

6  **can't -- I can't go and tell nobody not**

7  **to incarcerate somebody. I mean, I**

8  **don't -- I don't -- I don't get into**

9  **all that.**

10 Q.   Yeah.

11 **A.   I just have a job -- I've got a job to**

12 **do. When they come to us, I've got a**

13 **job to do. I can't --**

14 Q.   But you can't hire anybody either, can

15 you?

16 **A.   I don't do the hiring. We've got a**

17 **personnel department in Montgomery.**

18 Q.   I know, but I asked you one of the

19 things that could be done and you said

20 hire more officers, so -- that's just

21 your opinion. I'm not saying you can

22 do it, but that's just your opinion,

23 right?

EXHIBIT B

# Deposition of Zachary McLemore

November 2, 2021

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://vimeo.com/
688393617/
fbf8a4975a

Page 1

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF ALABAMA

3      SOUTHERN DIVISION

4        CASE NUMBER

5      2:19-CV-00899-LSC-SGC

6

7  DEMARCUS COLEMAN,

8    Plaintiff,

9  V.

10  CORRECTIONAL OFFICER ZACHARY MCLEMORE, et al.,

11    Defendants.

12

13

14

15  DEPOSITION TRANSCRIPT OF

16    ZACKERY MCLEMORE

17

18

19

20    NOVEMBER 2, 2021

21      8:43 A.M.

22

23

Page 2

1    The deposition of ZACKERY MCLEMORE

2  was taken before Tanya D. Cornelius, CCR, on

3  November 2, 2021 by Richard Rice, commencing at

4  approximately 8:43 a.m., at The Rice Law Firm,

5  LLC, 115 Richard Arrington Jr. Boulevard, North,

6  Birmingham, Alabama pursuant to the stipulations

7  set forth herein.

8

9      STIPULATION

10    IT IS STIPULATED AND AGREED by and

11  between the parties through their respective

12  counsel that the deposition of ZACKERY MCLEMORE

13  may be taken before Tanya D. Cornelius, CCR and

14  Notary Public, State of Alabama at Large, at the

15  law offices of The Rice Law Firm, LLC, 115

16  Richard Arrington Jr. Boulevard, North,

17  Birmingham, Alabama, on November 2, 2021,

18  commencing at approximately 8:43 a.m.

19    IT IS FURTHER STIPULATED AND AGREED

20  that the signature to and the reading of the

21  by the witness is waived, the deposition to have

22  the same force and effect as if full compliance

23  had been had with all laws and rules of Court

Page 3

1  relating to the taking of depositions.

2    IT IS FURTHER STIPULATED AND AGREED

3  that it shall not be necessary for any

4  objections to be made by counsel to any

5  questions, except as to form or leading

6  questions and that counsel for the parties may

7  make objections and assign grounds at the time

8  of trial or at the time said deposition is

9  offered in evidence, or prior thereto.

10    IT IS FURTHER STIPULATED AND AGREED

11  that notice of filing of the deposition by the

12  Commissioner is waived.

13

14

15

16

17

18

19

20

21

22

23

Page 4

1      A P P E A R A N C E S

2

3

4  APPEARING ON BEHALF OF THE PLAINTIFF:

5    THE RICE LAW FIRM, LLC

6    BY:  Richard Rice, Esq.

7    115 Richard Arrington Jr. Blvd. North

8    Birmingham, Alabama  35203

9

10

11  APPEARING ON BEHALF OF THE DEFENDANTS:

12    OFFICE OF THE ATTORNEY GENERAL

13    BY:  Tara Hetzel, Esq.

14    501 Washington Avenue

15    Montgomery, Alabama  36130

16    (Via Zoom)

17

18  ALSO PRESENT:  Taylor Holland, Videographer

19

20

21

22

23

Page 5

```
 1           I N D E X
 2
 3        EXAMINATION INDEX
 4  ZACKERY MCLEMORE
 5     BY MR. RICE              9
 6
 7
 8      * * * * * * * * * * * * * *
 9
10        EXHIBIT INDEX
11  Plaintiff's Exhibit
12  1  Report              154
13  2  Aerial view         162
14  3  Report              173
15  4  Personnel file      279
16  5  Photo               193
17  6  Photo               194
18  7  Incident report     197
19  8  Investigation       197
20  9  Affidavit           197
21  10 Case list           256
22  11 Lawsuit             259
23  12 Lawsuit             261
```

Page 6

```
 1        EXHIBITS (Continuing)
 2
 3  13 Lawsuit             263
 4  14 Lawsuit             265
 5  15 Lawsuit             270
 6  16 Lawsuit             274
 7  17 Lawsuit             276
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 7

```
 1        I, Tanya D. Cornelius, a Certified
 2  Court Reporter, and a Notary Public for the
 3  State of Alabama at Large, acting as
 4  Commissioner, certify that on this date,
 5  pursuant to the Alabama Rules of Civil
 6  Procedure, and the foregoing stipulation of
 7  counsel, there came before me at the law offices
 8  of The Rice Law Firm, LLC, 115 Richard Arrington
 9  Jr. Boulevard, North, Birmingham, Alabama,
10  commencing at approximately 8:43 a.m. on
11  November 2, 2021, ZACKERY MCLEMORE, witness in
12  the above cause, for oral examination, whereupon
13  the following proceedings were had:
14
15
16
17
18        VIDEOGRAPHER:  Good morning.  We're
19  going to go on the record.  Today is November
20  2nd, 2021.  The time on the monitor is 8:43 a.m.
21  My name is Taylor Holland.  I'm here on behalf of
22  Cite Court Reporting of 1521 Mulberry Street,
23  Montgomery, Alabama.
```

Page 8

```
 1        This is the deposition of Mr. Zackery
 2  McLemore, which was noticed by Attorney Richard
 3  Rice for the case of Coleman V. McLemore, et al.
 4        Counsel, please identify yourselves
 5  for the record, starting with the plaintiff.
 6        MR. RICE:  Richard Rice on behalf of
 7  Mr. Demarcus Coleman.
 8        MS. HETZEL:  Tara Hetzel on behalf of
 9  the DOC, defendant.
10        VIDEOGRAPHER:  Thank you.
11        Will the court reporter please
12  administer the oath to the witness.
13
14
15        ZACKERY MCLEMORE,
16     being first duly sworn, was examined
17        and testified as follows:
18
19
20        THE REPORTER:  Will this be usual
21  stipulations?
22        MR. RICE:  Yes.
23        MS. HETZEL:  Yes, ma'am.
```

Page 9

1        EXAMINATION
2   BY MR. RICE:
3       Q.   Okay.  Mr. McLemore, my name is
4   Richard Rice, as I just stated.  I'm an attorney
5   representing Mr. Demarcus Coleman.  Have you ever
6   participated in a deposition before?
7       A.   No, sir.
8       Q.   Okay.  So this is your first
9   deposition?
10      A.   Yes, sir.
11      Q.   So today I'll be asking you a series
12  of questions, and it's important for only one of
13  us to speak at a time, because we have a court
14  reporter here who is going to be transcribing the
15  entire conversation.  And so it's difficult for
16  her to be able to hear both of us at the same
17  time if we're both speaking.
18           And I would ask that you answer any
19  question verbally, audibly with a yes or no if
20  that's appropriate.  Try to refrain from using
21  huh-uh (negative response) or uh-huh (positive
22  response), which is common.  We all do it, but
23  it's just not very conducive to us being able to

Page 10

1   keep a clean record for the deposition.
2           And if you don't understand one of my
3   questions, if it's mumbled or I'm talking too
4   fast or it's just not worded correctly, just tell
5   me that you don't understand, and, of course,
6   I'll try to restate the question in a way that's
7   more comprehensible.  And if you do answer the
8   question, though, I will assume that you
9   understand the question.
10           And your attorney is obviously
11  participating via Zoom.  And so, typically, if
12  she has an objection, you can still proceed to
13  answer the question after she finishes with her
14  objection, and she probably would instruct you
15  not to answer any questions that she doesn't want
16  you to answer.  But, otherwise, it should be fine
17  if she objects for you to proceed to answer the
18  question.  Is that acceptable to you?
19      A.   Yes.
20      Q.   Okay.  Would you state your name
21  again for the record, your full name?
22      A.   Zackery Scott McLemore.
23      Q.   Okay.  And I understand that you were

Page 11

1   working last night; is that right?
2       A.   Yes, sir.
3       Q.   Where do you work?
4       A.   Warrior Met, coal mines.
5       Q.   All right.  And what type of shift
6   did you work last night, how many hours?
7       A.   Twelve-hour shift, 7 P to 7 A.
8       Q.   How long have you been working in
9   that capacity?
10      A.   About a month.
11      Q.   Now, are you taking any type of
12  medication or anything today or in the last, say,
13  forty-eight hours that would impact your ability
14  to understand or respond to my questions
15  truthfully?
16      A.   No.
17      Q.   How old are you?
18      A.   Twenty-nine.
19      Q.   What year were you born?
20      A.   1992.
21      Q.   All right.  And where were you born?
22      A.   Winfield, Alabama.
23      Q.   Is that where you spent most of your

Page 12

1   childhood?
2       A.   Yes, sir.
3       Q.   And were you raised by both parents?
4       A.   Yes, both parents.
5       Q.   Any siblings?
6       A.   Yes.  I have three brothers and one
7   sister.
8       Q.   And did you attend any churches as a
9   child?
10      A.   Yes, I did.
11      Q.   What church is that?
12      A.   Rock City Church of God.
13      Q.   And is that the church you attend
14  now?
15      A.   No.
16      Q.   Would you consider yourself to be a
17  religious person?
18      A.   I do.
19      Q.   Okay.  Are you a member of a church?
20      A.   I am.
21      Q.   What church is that?
22      A.   Gum Springs.
23      Q.   Say that again for me.

Page 13

1    A.   Gum Springs, G-u-m, Springs.
2    Q.   Where is that located?
3    A.   Rock City, Alabama.  They're a
4  Freewill Baptist.
5    Q.   Freewill Baptist.  Okay.  Where is
6  Rock City, Alabama?
7    A.   It would be east of Winfield, west of
8  Jasper.
9    Q.   Okay.  And so did you as a child have
10 any aspirations, career aspirations?  What did
11 you want to do when you grew up?
12   A.   Law enforcement and coal miner.
13   Q.   Where did you attend high school?
14   A.   Brilliant.
15   Q.   What was the name of it?
16   A.   Brilliant High School.
17   Q.   That's an interesting name for a high
18 school.  What year -- did you graduate?
19   A.   Yes, I did.
20   Q.   Okay.  What year?
21   A.   2010.
22   Q.   And did you have any education beyond
23 high school?

Page 14

1    A.   No, sir.
2    Q.   Okay.  Did you play any sports in
3  high school?
4    A.   Yes, sir.
5    Q.   What sports did you play?
6    A.   Football, baseball, and track.
7    Q.   Okay.  Did you have any family
8  members when you were a kid that happened to be
9  incarcerated or ever put in jail?
10   A.   Yes, I did.
11   Q.   You did?  Who?
12   A.   My father and my brother.
13   Q.   What was your father incarcerated
14 for?
15   A.   I'm really not sure.  It was before I
16 was born.
17   Q.   Do you know how much time he served?
18   A.   A little over three years, I believe,
19 but he come back and was found not guilty.
20   Q.   What about your brother?
21   A.   He served eighteen months for
22 manufacturing controlled substance.
23   Q.   Do you know what your dad was charged

Page 15

1  for?  I know you said he was exonerated.
2    A.   I'm not sure.
3    Q.   So tell me about the process that you
4  follow to become a correctional officer.
5    A.   My uncle was a -- well, still is a
6  lieutenant with the Department of Corrections.  I
7  have several cousins that are with the Department
8  of Corrections.
9    Q.   What's your uncle's name?
10   A.   Archie Giddy.
11   Q.   Spell his last name for me.
12   A.   G-i-d-d-y.
13   Q.   What about your cousins, what are
14 their names?
15   A.   Kelsey Millwood.
16   Q.   Man or woman?
17   A.   Man.
18   Q.   And do you have another cousin that
19 works with the DOC?
20   A.   Not that's still working there.
21   Q.   Okay.  What was your cousin's name
22 that previously worked for the Alabama Department
23 of Corrections?

Page 16

1    A.   Chris Hallmark.
2    Q.   And your cousin, Mr. Giddy, where is
3  he?  Which facility is he working with?
4    A.   He is at Hamilton A & I now.
5    Q.   What about Mr. Millwood?
6    A.   Hamilton A & I.
7    Q.   And so your uncle maybe referred you
8  to the job; is that right?
9    A.   Yes.
10   Q.   And then you filled out an
11 application?
12   A.   Yes, sir.
13   Q.   Okay.  Did you have to take any
14 tests?
15   A.   Yes, sir, I took a on-site physical
16 agility test and a written test.
17   Q.   And how did you score on those tests?
18   A.   I passed.  I'm not sure what the
19 score was or anything.
20   Q.   Right.  And what motivated you to
21 want to become a correctional officer?
22   A.   It was a stepping stone in law
23 enforcement.

Zachary McLemore

1  Q.  Did you have aspirations to become a
2  police officer?
3  **A.  No, not anymore.**
4  Q.  What changed your mind?
5  **A.  Corrections.**
6  Q.  What about it?
7  **A.  Everything about it.  It's not what I**
8  **thought it would be.**
9  Q.  What did you initially think it would
10  be?
11  **A.  To help people.**
12  Q.  When you say help people, what kind
13  of people?  Who would you be helping?
14  **A.  Everyone, community, the people**
15  **incarcerated.**
16  Q.  When were you first hired by the
17  Alabama Department of Corrections?
18  **A.  July 2nd of 2012.**
19  Q.  And how long after the hire date did
20  you find out that it wasn't what you thought it
21  would be?
22  **A.  About nine years later.**
23  Q.  Was there one particular incident or

1  something that stands out to you that was a
2  pivotal moment to help you realize it wasn't what
3  you thought it would be?
4  **A.  No.  It's like any other job.  It's**
5  **got its good days and it's got its bad days.**
6  Q.  Yeah, but ultimately -- you said this
7  was something you kind of aspired to do as a kid,
8  and then after nine years, you just gave up on
9  your career dream, right?
10  **A.  Right.**
11  Q.  So the bad days outnumbered the good
12  days?
13  **A.  They did.  And then with everything**
14  **that's going on in the world with law**
15  **enforcement, it's too much of a jeopardy to put**
16  **myself in.**
17  Q.  What do you think -- what is going on
18  in the world with law enforcement?  What do you
19  mean by that?
20  **A.  That, I mean, they're getting shot.**
21  Q.  You knew that was one of the risks
22  when you signed up, right?
23  **A.  Yes, but not the way that it is now.**

1  Q.  Do you think more police officers are
2  being shot now than when you were a kid?
3  **A.  I believe so.**
4  Q.  Do you think the statistics would
5  support that or do you think it's just media
6  attention or what?
7  **A.  I'm not sure.**
8      MS. HETZEL:  Object to the form.
9  Q.  Do you think there's actually more
10  police officers being shot today based on the
11  statistics?
12  **A.  I'm not sure.**
13  Q.  Do you think that there's more media
14  coverage now about everything than there was when
15  you were a child?
16  **A.  I agree the media is covering**
17  **everything.**
18  Q.  And we'll probably come back to that,
19  because I do want to understand more about what
20  changed your mind about being a correctional
21  officer, but I want to ask you some more
22  background questions first.  Are you married?
23  **A.  I am.**

1  Q.  How long have you been married?
2  **A.  Ten years, I believe.**
3  Q.  Do you have any kids?
4  **A.  Yes, I have a five-year-old son.**
5  Q.  How would you describe yourself as a
6  father?
7  **A.  I think I'm your typical father.  I**
8  **spend every moment I can with my child, trying to**
9  **have fun doing what he needs to do, but raise him**
10  **to be a responsible adult.**
11  Q.  Has he started school already?
12  **A.  He has.**
13  Q.  What type of things do y'all do
14  together?
15  **A.  Play sports, play video games, watch**
16  **cartoons.**
17  Q.  Are you a fisherman?
18  **A.  I am.**
19  Q.  Okay.  Do you take your son fishing
20  with you?
21  **A.  I do.**
22  Q.  Do you feel like the dangerous
23  aspects of your job, did that sometimes create

Zachary McLemore                                              11/2/2021
                                                             11 (41 - 44)

Page 41

1  Corrections let you down as an employee?
2       MS. HETZEL:  Object to the form.
3    Q.   You can still answer the question.
4    A.   **No.**
5    Q.   Why not?
6    A.   **They had a job to do just like I did.**
7    Q.   Yeah, but as a kid, you wanted to be
8  a correctional officer.  That was your dream job.
9  And within nine years, your dream was taken away
10 from you.
11   A.   **We all have dreams.**
12   Q.   But if you would have been
13 transferred to Hamilton, do you think you still
14 would have left the Department of Corrections?
15   A.   **Possibly.**
16   Q.   It's possible.  Do you think it would
17 have been likely?
18   A.   **It would have been very likely.  If I**
19 **would have had the job opportunity that I have**
20 **now, yes.**
21   Q.   Have you ever looked at statistics to
22 compare, you know, what professions and which
23 jobs are the most dangerous?

Page 42

1    A.   **No.**
2       MS. HETZEL:  Object to the form.
3    Q.   Do you know whether or not working in
4  the coal mine is more dangerous than a
5  police officer or a correctional officer?
6       MS. HETZEL:  Object to the form.
7    A.   **I have no idea.**
8    Q.   Have you ever looked at the
9  statistics to see per capita the number of coal
10 miners that encounter dangerous or
11 life-threatening injury as opposed to a police
12 officer?
13      MS. HETZEL:  Object to the form.
14   A.   **No, I haven't.**
15   Q.   What is it about your current job
16 that you like better than being a correctional
17 officer?
18   A.   **The hands-on work and physical labor.**
19   Q.   Do you feel like you're contributing
20 to public safety as a coal miner in the same way
21 that you were as a correctional officer?
22      MS. HETZEL:  Object to the form.
23   A.   **Not personal safety, but I'm a**

Page 43

1  **resource that's a must have.**
2    Q.   What level of security is Donaldson?
3    A.   **I'm not sure.**
4    Q.   Do you know the different levels of
5  security for the prisons?
6    A.   **No.**
7    Q.   Do you know what your final salary
8  was as a correctional officer, as a senior
9  correctional officer for the Department of
10 Corrections?
11   A.   **No.**
12   Q.   You don't know the general range?
13   A.   **I cannot recall.**
14   Q.   Earlier you said the thing that you
15 were most proud of about being a correctional
16 officer was that you provided for your family; is
17 that not right?
18   A.   **Yes.**
19   Q.   But you don't know how much you
20 provided for them?  You don't know the amount?
21   A.   **I can't give you an exact figure.  A**
22 **roundabout number, I don't know.**
23   Q.   When you were a correctional officer,

Page 44

1  did you regularly work overtime?
2    A.   **Yes.**
3    Q.   Do you know on average how many
4  overtime hours you worked per week?
5    A.   **I have no idea.**
6    Q.   Do you think you worked at least
7  fifty hours per week?
8    A.   **Fifty hours of overtime per week?**
9    Q.   No.  Total.
10   A.   **Total?  I'm sure I did.**
11   Q.   Do you think you worked at least
12 sixty hours total per week?
13   A.   **Depending on the week.**
14   Q.   Sometimes you did, though?
15   A.   **Possibly.**
16   Q.   Do you think you ever worked seventy
17 hours a week?
18   A.   **I have no idea.**
19   Q.   Is it possible that you would have?
20   A.   **There's a very slight chance.**
21   Q.   And how would you describe the
22 benefits package that you received as a
23 correctional officer?

Page 277

1  told me to step in first, and then Speak, O'Neal,
2  McLemore.  When I go in, Zackery Speak told me to
3  face the wall while they shut my cell down.
4  After that, then he told me to stay facing
5  straight.  That when he hit me in the side of my
6  face, that when McLemore hit me in my back.  That
7  cast a burst to come out.  They started jumping
8  on me real bad.  That cost blood to go
9  everywhere.
10     Q.    Okay.  That's good.  Do you recall
11 this incident?
12     A.    No.
13     Q.    Do you dispute what happened even
14 though you don't remember it?
15     A.    Yeah, I mean, I dispute his
16 allegations.  I do remember the inmate.  He was
17 working for me in the kitchen when I quit.
18     Q.    When you did what?
19     A.    When I left the department.
20     Q.    He just made this story up as well?
21     A.    I'm -- there may have been an
22 incident, but I'm not sure about the -- I don't
23 remember the incident.

Page 278

1     Q.    Okay.
2           MR. RICE:  All right.  Let's take a
3  five-minute break.
4           VIDEOGRAPHER:  We'll go off the
5  record.  The time is 1:35 p.m.
6           (Whereupon, a brief recess was
7  taken.)
8           VIDEOGRAPHER:  We'll go back on the
9  record.  The time is 1:42 p.m.
10    Q.    (BY MR. RICE:)  All right, Mr.
11 McLemore.  You said you're no longer employed
12 with the Department of Corrections, right?
13    A.    No, sir.
14    Q.    Why not?
15    A.    I took a job where I would be home
16 more.
17    Q.    You took a job where you would be
18 home more?
19    A.    Yes.
20    Q.    That's the only reason?
21    A.    Yes.
22    Q.    Earlier you stated that when you were
23 a kid, you wanted to grow up and be a

Page 279

1  correctional officer, right?
2     A.    That was one of my dreams, yes.  Some
3  type of law enforcement.
4     Q.    You gave up on that dream?
5     A.    Yes.  I moved on to other dreams.
6     Q.    Such as what?
7     A.    Coal mining.
8     Q.    Do you remember what date -- what was
9  your last date of employment with the Department
10 of Corrections?
11    A.    It was either January or February of
12 this year.
13    Q.    Let me mark this personnel file as
14 Plaintiff's Exhibit 4.
15         (Plaintiff's Exhibit 4 was marked for
16 identification and a copy of same is attached
17 hereto.)
18    Q.    Do you recognize this letter from
19 your personnel file?
20    A.    Yes.
21    Q.    Did you write that letter?
22    A.    Yes, I did.
23    Q.    What is it?  What does it state?

Page 280

1     A.    This is my resignation letter.
2     Q.    And what does it say was your
3  effective date of your resignation?
4     A.    February 23rd of '21.
5     Q.    Okay.  And in that resignation
6  letter, did you say you were leaving your job so
7  you could have more time with your family?
8     A.    Yes, I did.
9     Q.    And is your testimony today that
10 there were no other factors that contributed to
11 your decision to leave your employment with the
12 Department of Corrections?
13    A.    Yes, that's correct.
14    Q.    The dangerous work environment didn't
15 have anything to do with it?
16    A.    Of course it had an extent to do with
17 it.  But, I mean, everything is dangerous.
18    Q.    But you left your quote/unquote
19 dangerous job for a more dangerous job, didn't
20 you?
21    A.    No.  The job that I left for was
22 building modular homes.
23    Q.    Okay.  What happened with that job?

EXHIBIT C

# Deposition of Joe Binder

November 4, 2021

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://www.youtube.com/
watch?v=5brxqM6VubI

Page 1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF ALABAMA

3        SOUTHERN DIVISION

4

5   CIVIL ACTION NUMBER:  2:19-cv-00899-LCS-SGC

6

7   DEMARCUS COLEMAN,

8        Plaintiff,

9        vs.

10   CORRECTIONAL OFFICER ZACKERY MCLEMORE, ET AL.,

11        Defendants.

12

13

14

15

16        VIDEOTAPED DEPOSITION

17             OF

18           JOE BINDER

19        November 4, 2021

20

21

22

23   REPORTED BY:  HOLLY M. HYATT, CCR

Page 2

1        STIPULATIONS

2

3        IT IS STIPULATED AND AGREED by and between

4   the parties through their respective counsel, that

5   the deposition of JOE BINDER may be taken before

6   Holly M. Hyatt, Commissioner, at the offices of The

7   Rice Firm, LLC, 115 Richard Arrington, Jr. Boulevard

8   North, Birmingham, Alabama, on November 4, 2021.

9

10        IT IS FURTHER STIPULATED AND AGREED that

11   the signature to and the reading of the deposition by

12   the witness is waived, the deposition to have the

13   same force and effect as if full compliance had been

14   had with all laws and rules of Court relating to the

15   taking of depositions.

16

17

18

19

20

21

22

23

Page 3

1        STIPULATIONS

2        (Continued)

3

4        IT IS FURTHER STIPULATED AND AGREED that it

5   shall not be necessary for any objections except as

6   to form or leading questions, and that counsel for

7   the parties may make objections and assign grounds at

8   the time of the trial, or at the time said deposition

9   is offered in evidence or prior thereto.

10

11        IT IS FURTHER STIPULATED AND AGREED that

12   the notice of filing of the deposition by the

13   Commissioner is waived.

14

15

16

17

18

19

20

21

22

23

Page 4

1        APPEARANCES

2

3   APPEARING ON BEHALF OF THE PLAINTIFF:

4

5   The Rice Firm, LLC
    Mr. Richard A. Rice
6   115 Richard Arrington Jr. Boulevard North
    Birmingham, Alabama 35203
7   (205) 618-8733
    rrice@rice-lawfirm.com
8

9

10   APPEARING ON BEHALF OF THE DEFENDANTS:

11

12   Office of the Attorney General
    Mr. J. Matt Bledsoe
13   State of Alabama
    501 Washington Avenue
14   Montgomery, Alabama 36130
    (334) 242-7300
15   matt.bledsoe@AlabamaAG.gov

16

17   ALSO PRESENT:

18     Mr. Taylor Holland, Videographer

19

20

21

22

23

Page 5

1                 I N D E X
2                        PAGE:
3
4          INDEX OF EXAMINATIONS
5
6   Examination By Mr. Rice              7
7
8          INDEX OF EXHIBITS
9
10  Plaintiff's Exhibit 1  Personnel File     94
11  Plaintiff's Exhibit 2  Aerial Photograph   126
12  Plaintiff's Exhibit 3  Drawing          132
13  Plaintiff's Exhibit 4  Drawing          150
14  Plaintiff's Exhibit 5  Incident Report    162
15  Plaintiff's Exhibit 6  Affidavit of Binder   162
16  Plaintiff's Exhibit 7  Use of Force Report  175
17  Plaintiff's Exhibit 8  Knabenshue Complaint  193
18  Plaintiff's Exhibit 9  Wilson Complaint   206
19  Plaintiff's Exhibit 10  Hill Complaint    208
20  Plaintiff's Exhibit 11  Stout Complaint   214
21  Plaintiff's Exhibit 12  King Complaint    219
22  Plaintiff's Exhibit 13  Gregory Hill        223
23  Complaint

Page 6

1          I, Holly M. Hyatt, CCR, a Court Reporter
2   and Notary Public of the State of Alabama, acting as
3   Commissioner, do certify that on this date, as
4   provided by the Alabama Rules of Civil Procedure and
5   the foregoing stipulation of counsel, there came
6   before me at the offices of The Rice Firm, LLC, 115
7   Richard Arrington, Jr. Boulevard North, Birmingham,
8   Alabama, on November 4, 2021, beginning at 9:21 a.m.,
9   JOE BINDER, witness in the above cause for oral
10  examination, whereupon the following proceedings were
11  had:
12          THE VIDEOGRAPHER:  All right.  Good
13  morning.  Today is November 4th, 2021.  The time is
14  9:21 a.m.  My name is Taylor Holland.  I'm here on
15  behalf of Cite Court Reporting of Montgomery,
16  Alabama.
17          This is the deposition of
18  Mr. Joe Binder which was noticed by attorney Richard
19  Rice for the case Coleman v. McLemore, et al.
20          Counsel, please identify yourselves for
21  the record starting with the plaintiff.
22          MR. RICE:  Richard Rice on behalf of
23  the plaintiff, Demarcus Coleman.

Page 7

1          MR. BLEDSOE:  Matt Bledsoe on behalf of
2   the defendants.
3          THE VIDEOGRAPHER:  All right.  And will
4   the court reporter please administer the oath to the
5   witness?
6
7          JOE BINDER,
8   being first duly sworn, was examined and testified as
9   follows:
10
11          THE COURT REPORTER:  Usual
12  stipulations?
13          MR. RICE:  It's fine with me.
14          MR. BLEDSOE:  Yes.
15
16  EXAMINATION BY MR. RICE:
17      Q.    All right.  Good morning, Mr. Binder.
18  Could you please state your full name for the record?
19      A.    Joe L. Binder.
20      Q.    What does the L stand for?
21      A.    Initial.
22      Q.    I know, but what is your middle name,
23  sir?

Page 8

1      A.    L.
2      Q.    L?  Okay.  Can you spell it?
3      A.    L.  Initial.  That's it.  Just
4   initial.
5      Q.    I know, but you're not going to state
6   your full --
7      A.    Oh, I did.
8      Q.    -- first name?
9      A.    I did.  Joe.
10          Oh, you want me to spell it.  J-O-E,
11  middle initial L, last name Binder, B-I-N-D-E-R.
12  That's the truth.
13      Q.    Well, I understand that you
14  want -- your attorney told me that you want me to get
15  you out of here by 2:00 o'clock.
16      A.    Right.
17      Q.    And we already had a bit of a delay.
18  It's 9:22.
19      A.    Uh-huh.
20      Q.    Okay.  And I have an obligation to
21  represent my client's interest --
22      A.    Uh-huh.
23      Q.    -- just like Mr. Bledsoe has a

Page 53

1   Next time it's going to be put on paper which means
2   that it'll be written counsel.
3       Q.    And if the problem persists beyond that
4   written counseling, then what happens then?
5       A.    It's called progressive discipline.
6   It goes to the next level.
7       Q.    What's the next level?
8       A.    The next level will be a reprimand.
9   And then if you keep doing that after so many
10  times, it will go to maybe a day suspension.
11      Q.    And when were you promoted to sergeant?
12            You said 22 years after you started.
13  What -- around what year was that?
14      A.    March '20, I believe.  March --
15  March, April.
16      Q.    Of 2020?
17      A.    Right.
18      Q.    And what type of criteria are
19  considered for a promotion?
20      A.    I have no write-ups.  Take the test,
21  be in good standards with APOST.
22      Q.    Can you tell me a -- a little bit about
23  the test that you had to take to be promoted?

Page 54

1       A.    It's a written exam; A, B, C, D,
2   mathematical, that's pretty much it.
3       Q.    And so you need to be knowledgeable of
4   the ADOC policies and regulations?
5       A.    Yes.
6       Q.    Okay.  Do you recall what your base
7   salary was as a correctional officer?
8       A.    As a correctional officer?
9       Q.    Yes, sir.
10      A.    I'm thinking 49, 48,000.
11      Q.    Uh-huh.  And how would you describe the
12  benefits package?
13      A.    It was -- it was decent.
14      Q.    And what type of raise did you receive
15  upon becoming a sergeant?
16      A.    I think it was maybe about a 5 or
17  $6,000 raise.
18      Q.    How much overtime did you typically
19  work?
20      A.    25 a week.
21      Q.    And you said you really didn't have a
22  choice in that, did you?
23      A.    Not really.

Page 55

1       Q.    Do you think that was a problem that
2   you were required to work overtime?
3       A.    Well, if you a team player -- like
4   with me, I'm a team player.  If they ask me, I'm
5   coming.  If another officer got something they need
6   to do, I'm coming.
7       Q.    So your loyalty was to your colleagues
8   and the other officers.  You wanted to be there for
9   them?
10      A.    No, the loyalty was to the State.
11  The State needed me.  If I don't come and the other
12  officer don't come, who is going to be on the
13  shift?
14      Q.    Do you think the State showed that same
15  type of loyalty to you?
16      A.    No.
17      Q.    How does that make you feel?
18      A.    Still have to come to work.
19      Q.    I know.  But how does it make you feel?
20      A.    Make me feel pissed sometime.  But
21  still got to have a job.
22      Q.    Do you feel taken advantage of?
23      A.    No.  I don't.  Because I've been

Page 56

1   working it for so long -- working it so long and
2   this is what I been doing for so long.  So say you
3   come -- need to come in, I'm coming in, but at the
4   same --
5       Q.    So --
6       A.    Say again?
7       Q.    I didn't mean to interrupt you.  You go
8   ahead.
9       A.    I'm just saying, you know, if you
10  don't come to work, you put more pressure on the
11  rest of the shift.  And as a team, that's what
12  needs to take place.
13      Q.    So do you think this was a burden
14  that's your burden to carry and you're just going to
15  do what you have to do?
16      A.    I've been doing it for 22, 23 years.
17      Q.    Can you tell me about some of the
18  training you received when you first started as a
19  correctional officer?
20      A.    Welcomes training, medical training,
21  the use of force -- lots more training.  Don't
22  remember it.
23      Q.    Uh-huh.  And what was the last training

Page 165

1  and assisted to his feet.  Inmate Coleman was
2  escorted to the infirmary for medical attention and
3  decontamination."
4      Q.     That's your affidavit?
5      A.     Yeah.
6      Q.     You wrote that?
7      A.     Uh-huh.
8      Q.     Is that the same thing you just told me
9  today?
10     A.     Pretty much.
11     Q.     Pretty much but not exactly, right?
12     A.     Correct.
13     Q.     Okay.  And you said that you -- you
14 noticed that Coleman was in an aggressive stance?
15     A.     Right.
16     Q.     What does that mean?
17     A.     That means standing in a box stance.
18     Q.     A box stance?
19     A.     Like shoulder -- shoulder
20 width -- feet shoulder-width apart.
21     Q.     Do you feel threatened if you see a man
22 standing in front of you with his feet under his
23 shoulders?

Page 166

1      A.     Yeah.  If he's standing in boxer
2  stand with his hands clenched and making the -- the
3  audible things that he was speaking, yes.
4      Q.     Was it -- was those audible
5  things -- you consider those things he was speaking
6  to be a threat or to be threatening?
7      A.     Well, he was making a threat towards
8  an officer.
9      Q.     And you took him seriously at that
10 point where he says he's going to -- he wants
11 to -- wanted the white boy one-on-one?
12     A.     I kind of thought it was -- I kind of
13 thought he was crazy.
14     Q.     Because Big G was there too, right?
15     A.     Right.  He was there too.
16     Q.     And you were there too?
17     A.     I was there.
18     Q.     Under what circumstances would you
19 allow an inmate to challenge an officer to a
20 one-on-one fight?
21     A.     It wasn't that it was allowed, it was
22 something that he acted on.  Because if I was put
23 in his position and they told me to get back in the

Page 167

1  cell, I would have never came out the cell.
2      Q.     I know.  But I -- don't you -- aren't
3  you saying two different things at one time right
4  now?
5             Because the reason why I'm asking you
6  that question is this, you said he acted on it.  How
7  did he act on what he was saying?
8      A.     He attempted to swing.
9      Q.     He attempted to swing first before any
10 force was used against him?
11     A.     Right.
12     Q.     That's not what you said, though, is
13 it?
14     A.     Yeah.
15     Q.     And when he attempted to swing on him,
16 how close was he to McLemore at that point?
17     A.     McLemore was standing in front of the
18 door --
19     Q.     And he swung at --
20     A.     And the door -- the door -- McLemore
21 like this here (indicating), and he tried to swing
22 on Moore but Moore would -- I mean, McLemore was
23 still in front of the door at the two and a half --

Page 168

1  you know, the swing.
2      Q.     Uh-huh.
3      A.     Big G would have been to his left.  I
4  would have been to his left.
5      Q.     He swung and he missed?
6      A.     I don't know if he connected or not.
7      Q.     Yeah.  Because in your statement, you
8  said he -- he attempted to swing on Officer McLemore?
9      A.     Right.  But I say, I don't know if he
10 connected or not.
11     Q.     And when you say attempted to swing, it
12 kind -- it could mean different things if I'm really
13 just thinking about it because --
14     A.     He went through the motion.
15     Q.     So that's not an attempted swing.  It
16 is a swing then, right?  It's a swing and a miss?
17     A.     Attempted swing.  Okay.
18     Q.     Is that right?
19     A.     Yeah.
20     Q.     So he did swing?
21     A.     Right.
22     Q.     But he didn't make contact?
23     A.     Right.  But that don't mean it wasn't

EXHIBIT D

# Deposition of Shannon Caldwell

February 8, 2022

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://vimeo.com/
688555512/73df9826bb

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF ALABAMA

 3                    SOUTHERN DIVISION

 4

 5   CASE NUMBER:  2:19-cv-00899-LSC-SGC

 6

 7   DEMARCUS COLEMAN,

 8            Plaintiff,

 9        vs.

10   CORRECTIONAL OFFICER ZACHARY MCLEMORE, et al.,

11            Defendants.

12

13

14

15

16             VIDEOTAPED ZOOM DEPOSITION

17                        OF

18                 SHANNON CALDWELL

19                 February 8, 2022

20

21

22

23   REPORTED BY:  HOLLY M. HYATT, CCR
```

Cite, LLC

Shannon Caldwell                                   2/8/2022
                                                          2

```
  1                S T I P U L A T I O N S

  2

  3          IT IS STIPULATED AND AGREED by and between

  4    the parties through their respective counsel, that

  5    the deposition of SHANNON CALDWELL may be taken

  6    before Holly M. Hyatt, Commissioner, via Zoom

  7    Videoconference from various locations in Alabama on

  8    February 8, 2022.

  9

 10          IT IS FURTHER STIPULATED AND AGREED that

 11    the signature to and the reading of the deposition by

 12    the witness is waived, the deposition to have the

 13    same force and effect as if full compliance had been

 14    had with all laws and rules of Court relating to the

 15    taking of depositions.

 16

 17

 18

 19

 20

 21

 22

 23
```

```
1                S T I P U L A T I O N S

2                     (Continued)

3

4            IT IS FURTHER STIPULATED AND AGREED that it

5   shall not be necessary for any objections except as

6   to form or leading questions, and that counsel for

7   the parties may make objections and assign grounds at

8   the time of the trial, or at the time said deposition

9   is offered in evidence or prior thereto.

10

11           IT IS FURTHER STIPULATED AND AGREED that

12  the notice of filing of the deposition by the

13  Commissioner is waived.

14

15

16

17

18

19

20

21

22

23
```

```
 1                A P P E A R A N C E S

 2

 3    APPEARING ON BEHALF OF THE PLAINTIFF:

 4

 5      The Rice Firm, LLC
        Mr. Richard A. Rice
 6      115 Richard Arrington Jr. Boulevard North
        Birmingham, Alabama 35203
 7      (205) 618-8733
        rrice@rice-lawfirm.com
 8

 9

10    APPEARING ON BEHALF OF THE DEFENDANTS:

11

12      Office of the Attorney General
        Mr. J. Matt Bledsoe
13      State of Alabama
        501 Washington Avenue
14      Montgomery, Alabama 36130
        {334} 242-7300
15      matt.bledsoe@AlabamaAG.gov

16

17    ALSO PRESENT:

18       Mr. Taylor Holland, Videographer

19

20

21

22

23
```

```
 1                    I N D E X

 2                                        PAGE:

 3

 4              INDEX OF EXAMINATIONS

 5

 6   Examination By Mr. Rice                  7

 7

 8

 9              INDEX OF EXHIBITS

10

11   Plaintiff's Exhibit 1  4/19 DOJ Findings    68

12   Plaintiff's Exhibit 2  Ashley Photo         74

13   Plaintiff's Exhibit 3  Coleman Photo        73

14   Plaintiff's Exhibit 4  Use of Force Report  77

15   Plaintiff's Exhibit 5  Coleman Side Photo   100

16   Plaintiff's Exhibit 7  Hot Bay Incidents    121

17   Plaintiff's Exhibit 8  7/20 DOJ Findings    131

18   Plaintiff's Exhibit 9  Steven Davis Photo   128

19       *Exhibit 6 was not mentioned or marked.

20

21

22

23
```

```
1              I, Holly M. Hyatt, CCR, a Court Reporter

2    and Notary Public of the State of Alabama, acting as

3    Commissioner, do certify that on this date, as

4    provided by the Alabama Rules of Civil Procedure and

5    the foregoing stipulation of counsel, there came

6    before me via Zoom videoconference from various

7    locations in Alabama on February 8, 2022, beginning

8    at 1:52 p.m., SHANNON CALDWELL, witness in the above

9    cause for oral examination, whereupon the following

10   proceedings were had:

11              THE VIDEOGRAPHER:  All right.  We're

12   gonna go on the record.  The date is February 8th,

13   2022.  The time is 1:52 p.m. Central standard.

14              My name is Taylor Holland.  I'm here on

15   behalf of Cite Court Reporting of Montgomery,

16   Alabama.  This is the deposition of Mr. Shannon

17   Caldwell, which was noticed by attorney Richard Rice

18   for the case Coleman V McLemore, et al.

19              Counsel, please identify yourselves for

20   the record starting with the plaintiff.

21              MR. RICE:  Richard Rice for the

22   plaintiff.

23              MR. BLEDSOE:  Matt Bledsoe for the
```

1    defendants, Binder, McLemore, and Gadson.

2              THE VIDEOGRAPHER:  Thank you.

3              And will the court reporter please

4    administer the oath to the witness?

5

6              SHANNON CALDWELL,

7    having been first duly sworn, was examined and

8    testified as follows:

9

10             THE COURT REPORTER:  Usual

11   stipulations?

12             MR. RICE:  Yes.

13             MR. BLEDSOE:  Yes.

14

15   EXAMINATION BY MR. RICE:

16        Q.    Okay.  Captain Caldwell -- is it

17   captain?

18        A.    Yes, sir.

19        Q.    Okay.  Thank you.  My name is Richard

20   Rice.  I'm an attorney for DeMarcus Coleman.  And I

21   guess are you the only person in the room right now?

22        A.    I am.  I am.

23        Q.    Okay.  Do you mind removing your mask,

1  that you followed to become a correctional officer.

2      A.      Needed a job, put an application in

3  because my cousin said they was hiring, and I been

4  here ever since.

5      Q.      Okay.  And when did you start?

6      A.      September 16th, 2002.

7      Q.      Okay.  And why did you want to become a

8  correctional officer?

9      A.      I needed a job.

10     Q.      How much longer do you plan to work for

11 the Department of Corrections?

12     A.      Five years.

13     Q.      And why five years?

14     A.      Because I got 20 years now, and I can

15 right retire with 25 years retirement.

16     Q.      Okay.  What are you planning to do

17 next?

18     A.      I don't know.

19     Q.      Okay.  How many other prisons have

20 you -- how many prisons have you been assigned to?

21     A.      Four.

22     Q.      Okay.  Tell me what prisons.

23     A.      St. Clair.

1   second paragraph as well.  Do you agree with that?

2        A.      April 15th, correct.

3        Q.      Okay.  April 15th.  Okay.  And then it

4   says that a month later, May 15th, 2019, at

5   10:08 p.m., I guess were you -- you were there in

6   your office at that time, and that's when you

7   determined that the use of force was justified and

8   reasonable; is that right?

9        A.      Yes, sir.  It's not finished.  That's

10  when the investigation was completed, and I was

11  able to put the information into the system.

12       Q.      And do you know when you started the

13  investigation?

14       A.      I -- I can't say exactly, but it was

15  probably two days before it was inputted to make

16  sure I got everybody seen.  So no -- so probably

17  the 13th I started it.

18       Q.      You probably started the investigation

19  on May 13th?

20       A.      That's what I'm saying, yeah.

21       Q.      So you waited almost 30 days to start

22  the investigation, and then the investigation lasted

23  two days, right?

```
 1              MR. BLEDSOE:  Object to the form.

 2       A.      You say I waited 30 -- that's date I

 3  got to this incident report to deal with this use

 4  of force.

 5       Q.      (BY MR. RICE:)  And when I say when did

 6  you start the investigation, when did you first begin

 7  to speak to witnesses, speak to the officer, speak to

 8  the inmate?  When did you start that process?

 9       A.      It was probably, like I said, on May

10  the 13th, probably two days before this was

11  inputted into the system.  I don't know exactly.

12       Q.      Why do you say it was probably

13  May 13th?

14       A.      Because like I said, you know,

15  just -- justifying just saying -- just saying, hey,

16  probably two days to take care of an incident

17  report, just to make sure I've got the inmates and

18  the officers to my office to make sure I've seen

19  everybody.

20              Because I don't know if the officer

21  was off.  I don't know if they was at work that

22  day, off that day, to make sure that I got to

23  everybody, so it probably would take two days to
```

1   make sure that everybody involved with the incident

2   was seen.

3        Q.      Why would you wait until May 13 to

4   investigate an incident that occurred on April 15th?

5        A.      Probably because I had other details

6   to do during that time.  I mean it -- you know, it

7   just fell on that time.  That's when I got to that

8   on the priority list.

9                You know, I had this use of force

10  needed to be conducted, and I got to it at that

11  time.

12       Q.      It wasn't really a priority for you, is

13  that what you're telling me?

14       A.      That's not what I --

15               MR. BLEDSOE:  Object to the form.

16       A.      What I'm saying is that things go on

17  at the institution and it may be some other use of

18  force that came before that one.  And also, that we

19  have other things that's going on at the

20  institution where I wasn't able to get to

21  the -- that use of force at the time.

22       Q.      (BY MR. RICE:)  And do you -- in your

23  opinion, do you think that you may be able to conduct

EXHIBIT E

# Deposition of George Adams

February 8, 2022

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://vimeo.com/
688542232/7eb3b9023d

George Adams                                    2/8/2022
                                                    1

```
1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5    CASE NUMBER:  2:19-cv-00899-LSC-SGC

6

7    DEMARCUS COLEMAN,

8            Plaintiff,

9         vs.

10   CORRECTIONAL OFFICER ZACHARY MCLEMORE, et al.,

11           Defendants.

12

13

14

15

16           VIDEOTAPED ZOOM DEPOSITION

17                      OF

18                 GEORGE ADAMS

19              February 8, 2022

20

21

22

23   REPORTED BY:  HOLLY M. HYATT, CCR
```

George Adams                                            2/8/2022

2

1                      S T I P U L A T I O N S

2

3              IT IS STIPULATED AND AGREED by and between

4      the parties through their respective counsel, that

5      the deposition of GEORGE ADAMS may be taken before

6      Holly M. Hyatt, Commissioner, via Zoom

7      Videoconference from various locations in Alabama on

8      February 8, 2022.

9

10             IT IS FURTHER STIPULATED AND AGREED that

11     the signature to and the reading of the deposition by

12     the witness is waived, the deposition to have the

13     same force and effect as if full compliance had been

14     had with all laws and rules of Court relating to the

15     taking of depositions.

16

17

18

19

20

21

22

23

George Adams                                          2/8/2022
                                                          3

```
1              S T I P U L A T I O N S

2                   (Continued)

3

4         IT IS FURTHER STIPULATED AND AGREED that it

5    shall not be necessary for any objections except as

6    to form or leading questions, and that counsel for

7    the parties may make objections and assign grounds at

8    the time of the trial, or at the time said deposition

9    is offered in evidence or prior thereto.

10

11        IT IS FURTHER STIPULATED AND AGREED that

12   the notice of filing of the deposition by the

13   Commissioner is waived.

14

15

16

17

18

19

20

21

22

23
```

George Adams                                          2/8/2022
                                                           4

```
 1              A P P E A R A N C E S

 2

 3    APPEARING ON BEHALF OF THE PLAINTIFF:

 4

 5      The Rice Firm, LLC
        Mr. Richard A. Rice
 6      115 Richard Arrington Jr. Boulevard North
        Birmingham, Alabama 35203
 7      (205) 618-8733
        rrice@rice-lawfirm.com
 8

 9

10    APPEARING ON BEHALF OF THE DEFENDANTS:

11

12      Office of the Attorney General
        Mr. J. Matt Bledsoe
13      State of Alabama
        501 Washington Avenue
14      Montgomery, Alabama 36130
        {334} 242-7300
15      matt.bledsoe@AlabamaAG.gov

16

17    ALSO PRESENT:

18       Mr. Taylor Holland, Videographer

19

20

21

22

23
```

George Adams                                                2/8/2022
                                                                  5

```
 1                        I N D E X

 2                                                 PAGE:

 3

 4                 INDEX OF EXAMINATIONS

 5

 6    Examination By Rice                            7

 7    Examination By Mr. Bledsoe                     89

 8

 9

10

11                 INDEX OF EXHIBITS

12

13    Plaintiff's Exhibit 1  Aerial View Photo      34

14    Plaintiff's Exhibit 2  DOJ Investigative       45

15    Findings, First Installment

16    Plaintiff's Exhibit 3   Coleman Photo          58

17    Plaintiff's Exhibit 4   Coleman Statement      60

18    Plaintiff's Exhibit 5   7/23/20 DOJ Report     70

19

20

21

22

23
```

1              I, Holly M. Hyatt, CCR, a Court Reporter

2    and Notary Public of the State of Alabama, acting as

3    Commissioner, do certify that on this date, as

4    provided by the Alabama Rules of Civil Procedure and

5    the foregoing stipulation of counsel, there came

6    before me via Zoom videoconference from various

7    locations in Alabama on February 8, 2022, beginning

8    at 9:38 a.m., GEORGE ADAMS, witness in the above

9    cause for oral examination, whereupon the following

10   proceedings were had:

11              THE VIDEOGRAPHER:  All right.  We're

12   gonna go on the record.  The date is February 8th,

13   2022.  The time is 9:38 a.m. Central standard.  My

14   name is Taylor Holland.  I'm here on behalf of Cite

15   Court Reporting in Montgomery, Alabama.

16              This is the deposition of Mr. George

17   Adams which was noticed by attorney Richard Rice for

18   the case Coleman V McLemore, et al.

19              Counsel, please identify yourselves for

20   the record starting with the plaintiff.

21              MR. RICE:  Richard Rice on behalf of

22   Mr. DeMarcus Coleman.

23              MR. BLEDSOE:  Matt Bledsoe on behalf of

George Adams                                        2/8/2022

1    the defendants.

2                   THE VIDEOGRAPHER:  Thank you.

3                   Will the court reporter please

4    administer the oath to the witness?

5

6                   GEORGE ADAMS,

7    being first duly sworn, was examined and testified as

8    follows:

9

10                  THE COURT REPORTER:  Usual

11   stipulations?

12                  MR. BLEDSOE:  Yes.

13                  MR. RICE:  That's fine.

14

15   EXAMINATION BY RICE:

16        Q.    All right.  Mr. Adams, my name is

17   Richard Rice as I just stated, representing

18   Mr. Coleman.  Is this your first time participating

19   in a deposition?

20        A.    No.

21        Q.    Okay.  All right.

22        A.    I mean, regarding --

23        Q.    Go ahead.

1          Q.      Well, what about (audio cutout) -- did

2     you know him?

3                  THE REPORTER:  I lost your question

4     again, Mr. Rice.

5          Q.      Chaplain, did you know Officer

6     McLemore?

7          A.      Yes.

8          Q.      Did you have a personal relationship

9     with him?

10         A.      No.  Other than just passing and

11    sometimes going into the blocks when I conducted

12    classes or so in there.

13         Q.      Did Officer McLemore have any type of

14    reputation that you were aware of?

15                 MR. BLEDSOE:  Object to the form.

16         A.      Other than, yeah, hearing inmates say

17    that, you know, he -- he was one of those

18    individuals.  Yeah.

19         Q.      (BY MR. RICE:)  "One of those

20    individuals," that would be what, sir?

21         A.      That may have used force.

22         Q.      Used excessive force, was that -- was

23    that what the inmates said?

George Adams                                          2/8/2022

1                    MR. BLEDSOE:  Object to the form.

2          A.      Yes, uh-huh.

3          Q.      (BY MR. RICE:)  And did you know

4   Officer Binder?

5          A.      Yes.

6          Q.      And you stated that Officer Binder also

7   had a reputation for using excessive force?

8          A.      Yes.

9          Q.      Did you know an Officer Speaks?

10         A.      I -- I vaguely remember him.  Speaks,

11  Speaks, Speaks.  I don't know that he was in

12  the -- around long enough for me to -- I just can't

13  picture him right now at the moment or recall him.

14         Q.      Are you aware that Officer Gadson,

15  Officer McLemore, and Binder have been sued numerous

16  times for excessive force?

17                    MR. BLEDSOE:  Object to the form.

18         A.      No.

19         Q.      (BY MR. RICE:)  Okay.  Would it

20  surprise you if I told you they were -- they have

21  been sued numerous times for excessive force?

22         A.      No.

23         Q.      Have you ever heard of Officer Binder

EXHIBIT F

# Deposition of David Bucher

February 8, 2022

Coleman v. McLemore, et al.

2:19-cv-00899-LSC-SGC



866.993.0207
info@citedepos.com
www.citedepos.com
https://vimeo.com/
688551051/ca32f573b7

David Bucher                                    2/8/2022

1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF ALABAMA

 3                 SOUTHERN DIVISION

 4

 5    CASE NUMBER:  2:19-cv-00899-LSC-SGC

 6

 7   DEMARCUS COLEMAN,

 8          Plaintiff,

 9      vs.

10   CORRECTIONAL OFFICER ZACHARY MCLEMORE, et al.,

11          Defendants.

12

13

14

15

16          VIDEOTAPED ZOOM DEPOSITION

17                  OF

18              DAVID BUCHER

19           February 8, 2022

20

21

22

23   REPORTED BY:  HOLLY M. HYATT, CCR
```

David Bucher                                          2/8/2022
                                                         2

```
 1              S T I P U L A T I O N S

 2

 3          IT IS STIPULATED AND AGREED by and between

 4    the parties through their respective counsel, that

 5    the deposition of DAVID BUCHER may be taken before

 6    Holly M. Hyatt, Commissioner, via Zoom

 7    Videoconference from various locations in Alabama on

 8    February 8, 2022.

 9

10          IT IS FURTHER STIPULATED AND AGREED that

11    the signature to and the reading of the deposition by

12    the witness is waived, the deposition to have the

13    same force and effect as if full compliance had been

14    had with all laws and rules of Court relating to the

15    taking of depositions.

16

17

18

19

20

21

22

23
```

David Bucher                                          2/8/2022
                                                          3

```
 1              S T I P U L A T I O N S

 2                    (Continued)

 3

 4          IT IS FURTHER STIPULATED AND AGREED that it

 5   shall not be necessary for any objections except as

 6   to form or leading questions, and that counsel for

 7   the parties may make objections and assign grounds at

 8   the time of the trial, or at the time said deposition

 9   is offered in evidence or prior thereto.

10

11          IT IS FURTHER STIPULATED AND AGREED that

12   the notice of filing of the deposition by the

13   Commissioner is waived.

14

15

16

17

18

19

20

21

22

23
```

```
 1                    A P P E A R A N C E S

 2

 3     APPEARING ON BEHALF OF THE PLAINTIFF:

 4

 5       The Rice Firm, LLC
         Mr. Richard A. Rice
 6       115 Richard Arrington Jr. Boulevard North
         Birmingham, Alabama 35203
 7       (205) 618-8733
         rrice@rice-lawfirm.com
 8

 9

10     APPEARING ON BEHALF OF THE DEFENDANTS:

11

12       Office of the Attorney General
         Mr. J. Matt Bledsoe
13       State of Alabama
         501 Washington Avenue
14       Montgomery, Alabama 36130
         {334} 242-7300
15       matt.bledsoe@AlabamaAG.gov

16

17     ALSO PRESENT:

18        Mr. Taylor Holland, Videographer

19

20

21

22

23
```

David Bucher                                              2/8/2022
                                                              5

```
 1                    I N D E X

 2                                        PAGE:

 3

 4              INDEX OF EXAMINATIONS

 5

 6    Examination By Mr. Rice                  7

 7    Examination By Mr. Bledsoe              63

 8

 9

10              INDEX OF EXHIBITS

11
```

```
12    Plaintiff's Exhibit 3  Coleman Photo      41

13    Plaintiff's Exhibit 4  Coleman Statement  42

14    Plaintiff's Exhibit 5  7/20 DOJ Findings  48
```

```
15

16

17

18

19

20

21

22

23
```

Cite, LLC

David Bucher                                    2/8/2022

1          I, Holly M. Hyatt, CCR, a Court Reporter

2    and Notary Public of the State of Alabama, acting as

3    Commissioner, do certify that on this date, as

4    provided by the Alabama Rules of Civil Procedure and

5    the foregoing stipulation of counsel, there came

6    before me via Zoom videoconference from various

7    locations in Alabama on February 8, 2022, beginning

8    at 11:35 a.m., DAVID BUCHER, witness in the above

9    cause for oral examination, whereupon the following

10    proceedings were had:

11                   THE VIDEOGRAPHER:  All right.  We're

12    going on the record.  The date is February 8th,

13    2022.  The time is 11:35 a.m. Central standard.  My

14    name is Taylor Holland.  I'm here on behalf of Cite

15    Court Reporting in Montgomery, Alabama.

16                   This is the deposition of Mr. David

17    Bucher, which was noticed be attorney Richard Rice

18    for the case Coleman V. McLemore, et al.

19                   Counsel, please identify yourselves for

20    the record starting with the plaintiff.

21                   MR. RICE:  Richard Rice on behalf of

22    the plaintiff.

23                   MR. BLEDSOE:  Matt Bledsoe on behalf of

1   the defendants.

2                   THE VIDEOGRAPHER:  Thank you.  Will the

3   court reporter please administer the oath to the

4   witness?

5

6                   DAVID BUCHER,

7   having been duly sworn, was examined and testified as

8   follows:

9

10                  THE COURT REPORTER:  Usual

11  stipulations?

12                  MR. RICE:  Yes.

13                  MR. BLEDSOE:  Yes.

14

15  EXAMINATION BY MR. RICE:

16       Q.      Okay.  Mr. Bucher, my name is Richard

17  Rice.  As I stated, I'm an attorney representing

18  plaintiff DeMarcus Coleman who was formerly

19  incarcerated with the Department of Corrections.

20                  And he's filed a lawsuit against the

21  Department of Corrections and several of their

22  employees.  And we have a -- I have a few questions

23  for you today.

```
 1              If you could first, please state your

 2    name for the record.

 3         A.      David Bucher.

 4         Q.      Okay.  And are you currently taking any

 5    medication that will impact your ability to be honest

 6    or recall certain facts today?

 7         A.      No.  No, sir.

 8         Q.      Okay.  And could you tell me your date

 9    of birth?

10         A.      March 12, 1975.

11         Q.      Okay.  And what city were you born?

12         A.      I was born in Lebonay [phonetic],

13    Pennsylvania.

14         Q.      And just to take a step back, is this

15    your first time participating in a deposition as a

16    witness?

17         A.      Yes, sir.

18         Q.      Okay.  So just some of the basic ground

19    rules would be just one of us should be speaking at a

20    time.  We have a court reporter here who's

21    transcribing everything.

22              If you don't understand a question,

23    just ask me to repeat it, and I'd be happy to do so.
```

David Bucher                                    2/8/2022
                                                     35

```
 1        A.      I -- there were some names that rose.
 2   You know, they -- I come from a farming background.
 3   The cream rises to the top.  This is not a good
 4   cream though, but there were certain names that
 5   rose to the top of the list, yes.
 6        Q.      Do you recall those names?
 7        A.      I would prefer not to just throw them
 8   out here.
 9        Q.      Okay.  Then what about Roger Gadson?
10        A.      I have a good working relationship
11   with Mr. Gadson.
12        Q.      Are you aware folks referring to Roger
13   Gadson as Big G?
14        A.      I have called him that myself.
15        Q.      And would it be safe to say Big G had a
16   reputation of using force and sometimes excessive
17   force?
18                MR. BLEDSOE:  Object to the form.
19        A.      He does have a reputation for that.
20        Q.      (BY MR. RICE:)  What about Officer
21   McLemore?
22        A.      I have --
23        Q.      Do you know --
```

David Bucher                                    2/8/2022
                                                      36

```
 1        A.      I have a good working relationship
 2   with Officer McLemore.
 3        Q.      Okay.  And does Officer McLemore have a
 4   reputation for using excessive force?
 5               MR. BLEDSOE:  Object to the form.
 6        A.      I have been told by inmates that he
 7   does have that reputation.  I have never witnessed
 8   it though.
 9        Q.      (BY MR. RICE:)  And Officer Binder.
10   Are you aware of Officer Binder having a reputation
11   for using excessive force?
12               MR. BLEDSOE:  Object to the form.
13        A.      Officer Binder from my knowledge over
14   the years would be more on the de -- verbal
15   derogatory side.  He's just a little man.
16   He's -- he's a small man like me, but -- but he did
17   not have a good reputation among the inmates.  No,
18   he did not.
19        Q.      (BY MR. RICE:)  And Officer Binder was
20   in a supervisory role, right?
21        A.      Yes.  He was a sergeant.
22        Q.      He was a sergeant.  There we go.
23        A.      Yes.
```

David Bucher                                                    2/8/2022

1    do remember is they might have been called the

2    crew.  But the kludge crew I do not remember.  No

3    one ever told me that specifically.

4          Q.      And do you know whether or not --

5                  Go ahead.

6          A.      I don't know if you were getting to

7    just plain crew or not, but I think I do remember

8    hearing something about the crew.

9          Q.      Okay.  All right.

10         A.      So...

11         Q.      Do you know whether or not the

12   Department of Corrections provides any type of

13   support to officers struggling with mental health

14   issues?

15         A.      I think it is available.  I don't

16   know any specifics -- yeah.  I believe it is

17   available.  And there is -- you may have heard

18   something about the CISM Committee, critical

19   incident stress management.

20                 There are a number of different staff

21   members on that committee that would be helpful to

22   things like this.  But -- yes.  I -- I think mental

23   health treatment would be available.  Whether it is

## EXHIBIT G

Deposition link: https://vimeo.com/688203583/5be5e106fb
No transcript available.